1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   REX CHAPPELL,

11          Plaintiff,                    No. 2:01-cv-01979 KJN P

12      vs.

13   SAM BESS, et al.,

14          Defendants.              <u>ORDER</u>

15   _____/

16   I.  <u>Introduction</u>

17          Plaintiff is a state prisoner, currently incarcerated at the California Correctional

18   Institution ("CCI"), in Tehachapi, California.  Plaintiff proceeds in this civil rights action with

19   court-appointed counsel.  Pursuant to the consent of the parties, this action proceeds before the

20   undersigned magistrate judge for all purposes.  (Dkt. No. 152.)  <u>See</u> 28 U.S.C. § 636(c); Local

21   Rule 305(a).

22          Each of the three defendants filed a separate motion for summary judgment and/or

23   summary adjudication, although the motions address substantially the same issues.  (Dkt. Nos.

24   197, 200, 201.)  Plaintiff filed an opposition to each motion (Dkt. Nos. 212, 213, 214), and each

25   defendant filed a reply (Dkt. Nos. 215-19).  In addition, defendant Bess filed statements of non-

26   opposition to the motions filed by defendants Quist and Pliler (Dkt. Nos. 208, 209); and

1  defendant Pliler filed a statement of non-opposition to the motions filed by defendants Quist and

2  Bess (Dkt. Nos. 199, 210).

3  The motions were heard before the undersigned on November 17, 2011.  Plaintiff

4  was represented by attorney Scott Handleman; defendant Samuel Bess was represented by

5  Jonathan Paul; defendant Michael Quist was represented by Kevin J. DeHoff; and defendant

6  Cheryl K. Pliler was represented by Michelle Angus.

7  For the reasons that follow, the court grants defendant Pliler's motion for

8  summary judgment in its entirety, and dismisses defendant Pliler from this action.  In addition,

9  the court:  (1) grants the motions of defendants Bess and Quist for summary judgment on

10  plaintiff's Eighth Amendment claim and state law malicious prosecution claim; (2) denies

11  defendants' motions for summary judgment on plaintiff's federal claims premised on conspiracy,

12  equal protection, fabrication of evidence, and malicious prosecution; and (3) denies defendants'

13  qualified immunity defenses.

14  II.  Background

15  This action proceeds on plaintiff's Amended Complaint ("AC" or "complaint"),

16  filed in pro se on March 12, 2002.  (Dkt. No. 7.)  The Amended Complaint alleges that

17  defendants Bess and Quist, correctional officers at California State Prison-Sacramento ("CSP-

18  SAC"), where plaintiff was then incarcerated, conspired to, and did in fact, plant heroin on

19  plaintiff on October 11, 1998, in retaliation against plaintiff for refusing to sell drugs on behalf of

20  defendant Bess.  Following a search of plaintiff by defendant Quist, plaintiff was subjected to

21  disciplinary charges and criminal prosecution, pursuant to which defendants Bess and Quist

22  allegedly made false statements.  The complaint alleges that defendant Pliler, then CSP-SAC

23  Warden, was aware of the allegedly fraudulent bases for these matters, but failed to exonerate

24  plaintiff or discipline defendants.  At plaintiff's criminal trial in March 2001, another inmate

25  testified that he had sold drugs and worked as a "snitch" for defendant Bess, and that he had

26  ////

1  planted the heroin on plaintiff at the direction of Bess.  (AC at ¶ 22.)[1]  Plaintiff was acquitted;

2  had plaintiff been convicted, it would have been his "third strike," and may have resulted in a life

3  sentence.

4        The Amended Complaint asserts three broad causes of action: (1) Eighth

5  Amendment right to be free from cruel and unusual punishment (AC at ¶ 38); (2) Fourteenth

6  Amendment right to "Federal Due Process/Equal Protection (Retaliation)" (id. at ¶ 40); and (3)

7  state law right to be free from malicious prosecution (id. at ¶ 42).

8        On March 10, 2003, defendants filed a motion to dismiss this action, based on the

9  argument that plaintiff's claims were time-barred.  The motion was denied on January 22, 2004.

10  (Dkt. Nos. 36, 34.)

11        On July 29, 2005, defendants filed a motion for summary judgment.  By findings

12  and recommendations filed March 8, 2006, a magistrate judge previously assigned this case

13  recommended that defendants' motion be granted, based on the finding that defendants were

14  entitled to qualified immunity on plaintiff's due process claim.  The magistrate judge found that

15  plaintiff had failed to state an Eighth Amendment claim, or a state law claim, and did not reach

16  plaintiff's equal protection claim.  (Dkt. No. 104.)  On April 10, 2006, the district judge adopted

17  these findings and recommendations. (Dkt. No. 107.)

18        Plaintiff appealed.  The Ninth Circuit Court of Appeals appointed counsel for

19  plaintiff on August 1, 2007, and the matter was heard on March 14, 2008.  On April 28, 2008, the

20  Court of Appeals filed a memorandum decision, which provides in full:

21        Appellant Rex Chappell (Chappell) appeals the district court's
          grant of summary judgment based on qualified immunity on
22        Chappell's due process claim, the district court's dismissal of
          Chappell's equal protection claim without comment, and the
23        district court's refusal to construe Chappell's state law allegations
          as a claim for malicious prosecution.

24

25        [1]  The court's citations to the Amended Complaint, the parties' respective depositions,
     and the superior court transcript, reflect the internal organization of these documents.  All other
26   citations to the record reflect the court's electronic pagination unless otherwise noted.

1          Pursuant to the agreement of the parties at oral argument,
       Chappell's due process claim and state law allegations stating a

2          claim for malicious prosecution are remanded to the district court
       for consideration on the merits.

3

4          We decline to address Chappell's equal protection claim on appeal,
       so as to allow the district court the opportunity to address it in the
       first instance on remand.

5

6          REVERSED AND REMANDED.

7   (See Memorandum Decision (Case No. 06-15805); Dkt. No. 119 at 1-2.)  Mandate was issued on

8   September 4, 2009.  (Dkt. No. 120.)

9          Following remand to this court, defendants filed a "joint response" wherein they

10   chose not to separately address plaintiff's equal protection claim, but instead deferred briefing

11   their challenge until such time as they pursued a dispositive motion addressing all of plaintiff's

12   claims.  (Dkt. No. 125.)  On January 6, 2010, the court appointed counsel to represent plaintiff,

13   and set a further status hearing.  (Dkt. Nos. 126, 128.)

14          This action was assigned to the undersigned on February 9, 2010 (Dkt. No. 129),

15   and assigned for all purposes on August 2, 2010 (Dkt. No. 152).  Pursuant to a status conference

16   held March 25, 2010, and subsequent requests and stipulations of the parties, discovery was

17   reopened until February 17, 2011, with the close of expert discovery on August 29, 2011.  (Dkt.

18   No. 162 at 4.)  On May 6, 2011, this court granted the request of plaintiff's former co-counsel to

19   withdraw their representation of plaintiff.  (Dkt. No. 189.)  Current counsel was appointed to

20   represent plaintiff on May 16, 2011.  (Dkt. No. 190.)  After reviewing each of the parties' status

21   reports filed in June and July 2011, the court retained the dispositive motion deadline of October

22   30, 2011.  (Dkt. No. 196.)  Defendants thereafter filed the instant motions for summary

23   judgment.

24   III.  Legal Standards for Summary Judgment

25          Summary judgment, in whole or in part (summary adjudication of issues), is

26   appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure

56(c) is met.  "The judgment sought should be rendered  if . . . there is no genuine issue as to any material fact, and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Federal Rule of Civil Procedure 56(c).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the disputed fact is material, i.e., a fact that might affect the outcome of

1   the suit under governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

2   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

3   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

4   for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809 F.2d at 631.

5          In the endeavor to establish the existence of such a factual dispute, the opposing

6   party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

7   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

8   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

9   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

10  genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e), Advisory

11  Committee's note on 1963 amendments).

12         In resolving a summary judgment motion, the court examines the pleadings,

13  depositions, answers to interrogatories, and admissions on file, together with any affidavits.  Fed.

14  R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  Anderson, 477 U.S. at

15  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

16  drawn in favor of the opposing party.  Matsushita, 475 U.S. at 587.  Nevertheless, inferences are

17  not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate

18  from which the inference may reasonably be drawn.  Richards v. Nielsen Freight Lines, 602 F.

19  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

20  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

21  some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could

22  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

23  trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

24  ////

25  ////

26  ////

6

IV.  Evidentiary Disputes Relative to Dixon Trial Testimony

On March 8, 2001, inmate Duane M. Dixon[2] testified on behalf of plaintiff at plaintiff's criminal trial, on the charges stemming from the October 11, 1998 incident.  Plaintiff has submitted, as an exhibit in support of his opposition to each pending motion, a transcript of Dixon's trial testimony in People v. Chappell, Sacramento County Superior Court Case No. 98FL10549.  (See Oppositions, Dkt. Nos. 212-5 (Exh. B); 213-5 (Exh. B); 214-5 (Exh. B).)

Defendant Bess objects to the introduction of Dixon's former testimony in People v. Chappell on the ground that there is no indication Dixon is currently unavailable to testify, and because defendant Bess had no opportunity to examine Dixon in the trial of People v. Chappell. (Dkt. No. 215 at 3, citing Fed. R. Evid 804(a), 804(b)(1).)

Federal Rule of Evidence 804 provides an exception to the hearsay rule (set forth in Fed. R. Evid. 803), to permit the introduction of a witness' former testimony for the truth of the matter asserted, provided the witness is currently unavailable, Fed. R. Evid. 804(a), and "the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination," Fed. R. Evid. 804(b)(1).

Bess' contention that "there is no indication that Dixon is currently unavailable" (Dkt. No. 215 at 3), appears to be accurate.  Bess' further contention that he [Bess] "had no opportunity or similar motive to examine Dixon in the trial of People v. Chappell" (id.), also appears to be technically correct, because the trial against plaintiff was prosecuted by the Sacramento County District Attorney's Office ("DA").  While the DA was necessarily tasked with examining Dixon as to his allegations against both Bess and Quist, the "similar motive"

_____

[2] The trial transcript spells Dixon's first name as "Dwayne," although the parties refer to Dixon both as "Dwayne" and "Duane."  The computerized log of Dixon's housing placements, admitted into evidence in this action, identifies him as "Duane Marlin Dixon."  (See e.g. Pliler Depo., Exh. 16.)  A search of CDCR's inmate locator website indicates that a Duane Marlin Dixon, presumably Dixon herein, was admitted to CDCR in 1992, and is presently incarcerated at the R.J. Donovan Correctional Facility in San Diego, California.  (None of the inmates named "Dwayne Dixon," identified in the CDCR inmate locator, have the middle initial "M.")  Accordingly, the court refers to this inmate as "Duane Dixon."

prong of Rule 804(b)(1) requires a careful, case-specific analysis, see United States v. Salerno, 505 U.S. 317, 325 (1992), not briefed by the parties.  The court need not, however, determine whether Dixon's testimony meets the criteria of Rule 804.  For present purposes, it is enough that plaintiff has demonstrated that Dixon's testimony was not only contrary to the factual recitations of defendants Bess and Quist, but sufficiently credible to the jury to exonerate plaintiff of criminal charges based on the same conduct at issue here.  The court does not rely on Dixon's testimony for its ultimate truth but, rather, to demonstrate that there are material factual disputes concerning the central issues in this case.  See U.S. v. Cantu, 876 F.2d 1134, 1137 (5th Cir. 1989) (reversing trial court's exclusion of witness statements admitted solely for the purpose of demonstrating that the statements were made, not for their truth, explaining that "[t]he statements were not offered as an assertion of a fact but, rather, as the fact of an assertion"); U.S. v. Chavis, 772 F.2d 100, 105 (5th Cir. 1985) (affirming admission of records "to show that defendants were notified of the complaints," not for the truth of the statements contained in the complaints); cf. Fed. R. Evid. 801(d) (prior statements of witness and party-opponents not generally hearsay).

Accordingly, the court overrules defendant Bess' objection to the admission of Dixon's trial testimony in support of plaintiff's opposition to the pending motions.  The fact of Dixon's testimony, in conjunction with the fact of plaintiff's acquittal on the criminal charges at the heart of this case, as well as plaintiff's admissible deposition testimony, support plaintiff's assertion that there remain material factual disputes precluding summary judgment on plaintiff's federal constitutional claims.

V.  Undisputed Facts

The following facts are either undisputed by the parties or, following the court's review of the evidence, have been deemed undisputed for purposes of the pending motions.

1.    On October 11, 1998, plaintiff Rex Chappell was an inmate incarcerated at CSP-SAC, in Facility B, Building 1 ("Unit B-1").

2.    On October 11, 1998, plaintiff had a cellmate named Keith ("Kiki") Williams.

3.   Through October 1998, defendant correctional officers Quist and Bess worked at CSP-SAC's Facility B.  Quist was assigned to Unit B-1 as a floor officer; Bess was assigned to Facility B as a yard officer.

4.   At all relevant times, defendant Pliler was the Warden of CSP-SAC.

5.   In 1998, inmate Duane Dixon was housed at CSP-SAC.

6.   On October 11, 1998, plaintiff was searched by defendant Quist.

7.   Quist thereafter completed a Rules Violation Report (Form CDC-115) ("RVR," "CDC 115," or "disciplinary charge"), Log No. B-98-10-70 (handwritten on October 11, 1998, typed and signed on October 13, 1998), in which Quist alleged that he found a bindle containing tar heroin in plaintiff's sock, in a quantity sufficient for trafficking; plaintiff was charged with a violation of California Code of Regulations ("CCR"), title 15, section 3016 (possession of controlled substance).

8.   Also on October 11, 1998, Lieutenant Hahn completed an Incident Report (Form CDC-837-A), Log No. SAC-FAB-98-10-0503, noting in pertinent part that the amount of heroin allegedly found in the bindle was greater than that required for personal use, indicating that plaintiff "meets the criteria as a distributor rather than a consumer." (Pliler Depo., Exh. 3.)

9.   On October 26, 1998, and November 4, 1998, Quist filed supplemental reports and added into evidence an eyedropper bottle containing heroin residue, that Quist had allegedly obtained from plaintiff pursuant to the October 11, 1998 search, but inadvertently taken home until reminded of the bottle by plaintiff.

10.  On October 17, 1998, plaintiff was placed in administrative segregation, where he remained through his acquittal on related criminal charges in March 2001.

11.  In November 1998, plaintiff wrote three letters to Warden Pliler in which he asserted that he had been "set up."

12.  On December 4, 1998, the DA accepted this matter for prosecution; a criminal complaint

1    was filed against plaintiff on December 10, 1998, in Sacramento Superior Court Case No.

2    98F10549, alleging violation of California Penal Code section 4573.6 (unauthorized

3    possession of controlled substance in a prison).

4    13.    On April 22, 1999, plaintiff was found guilty of the disciplinary charge of violating

5           Section 3016; however, because the hearing had not been held within the required thirty

6           days, plaintiff was assessed zero loss of credits.

7    14.    On March 19, 2001, plaintiff was acquitted by a jury of the criminal charge.

8    15.    On April 24, 2001, and June 7, 2001, plaintiff filed two separate administrative

9           grievances challenging the alleged misconduct of defendants Quist and Bess, and the

10          alleged failure of defendant Pliler to adequately respond.  Both grievances, designated

11          Log No. SAC-B-01-00933,[3] and Log No. SAC-S-01-01210,[4] respectively, were

13          [3] On April 24, 2001, plaintiff filed an administrative grievance/citizen's complaint (Log
     No. SAC-B-01-00933), pursuant to which he alleged that, "on October 11, 1998, Officers Bess
14   and Quist did conspire, and did set this write up with narcotic's plaintiff did not have.  I wrote
     letter's to Warden Pliler about the set up (and conspiracy) she did nothing.  I even gave this
15   Warden evidence that would've alerted any (real professional) to the fact that there very possibly
     could be a set up and conspiracy . . . [lengthy explanation provided]."  (Sic.)  (Pliler Depo., Exh.
16   9 at 1-3 (internal punctuation omitted); id., Exh. 10.)  First Level Review was bypassed.  The
     grievance was "partially granted" at the Second Level Review, because referred to the OIA for
17   investigation; the appeal was signed by Acting Chief Deputy Warden Burruel on behalf of
     Warden Pliler.  (Id., Exh. 9 at 2, 5; Pliler Depo at 79.)  As framed at the Director's Level,
18   plaintiff's appeal alleged that Bess and Quist "conspired and set him up with narcotics which
     resulted in a CDC Form 115, Rules Violation Report (RVR) and a referral to the Sacramento
19   County District Attorney.  [¶]  The appellant requests on appeal that the officers be investigated
     and tested for drugs, the RVR be expunged from his central file, any good time credits and his
20   classification score be restored, and that he [be] assigned to a job as he would have if he had not
     been set up."  (Id., Exh. 11 at 1.)  The appeal was denied at the Director's Level on October 25,
21   2001 (id., Exh. 10), with a notation that plaintiff's request for an investigation had been
     appropriately granted in part, and was still pending (id., Exh. 11 at 3.)

22          [4] Meanwhile, on June 7, 2001, plaintiff filed a second administrative grievance (Log No.
     SAC-S-01-01210), pursuant to which he alleged that, "I filed a complaint against officers M.O.
23   Quist and S. Bess in 1998, about these officers setting me up with drugs, because I would not sell
     drugs for C/O S. Bess.  I even wrote two letters to Warden Pliler who . . . aided these officers by
24   sending those letters . . . to the district attorney without the permission of this writer. . . ."  (Pliler
     Depo., Exh. 12 at 1-3 (internal punctuation omitted); id., Exh. 13.)  Plaintiff asserted a
25   conspiracy among Pliler, the assistant wardens, and unnamed sergeants and lieutenants, to lock
     plaintiff up in administrative segregation "as retaliation for litigation;" alleged the violation of
26   several federal constitutional and state statutory rights; and demanded that he "want[s] out of this

                                                      10

1    administratively exhausted.

2    16.    On October 24, 2001, plaintiff filed the instant action, alleging that defendants Quist and

3           Bess, with the help of inmate Dixon, had planted the heroin on plaintiff, and made false

4           statements in support of the disciplinary and criminal charges filed against plaintiff;

5           plaintiff also alleges that defendant Pliler failed to prevent this alleged misconduct or to

6           later discipline defendants Quist and Bess, and failed to exonerate plaintiff.

7    VI.  Disputed Facts

8                 Nearly all of the circumstances concerning the relevant events of October 11,

9    1998, are disputed.  Because defendants' separate motions for summary judgment, and plaintiff's

10   responses thereto, so conflate the disputed and purportedly undisputed facts, the court has

11   reviewed the sworn testimony of each party, as well as the trial testimony of inmate Dixon, to

12   discern the parties' significant factual disputes.  A summary of each of these individual's

13   testimony is provided below.

14             A.  Plaintiff's May 26, 2004 and September 23, 2010 Deposition Testimony[5]

15                 Plaintiff concedes that he is a heroin user.  He testified that there was heroin

16   residue in the subject eyedropper bottle because he had previously used it to ingest heroin

17   (Chappell 2004 Depo. at 51), including on the morning of the search (id. at 143-44.)  However,

18   plaintiff testified that he never sells heroin.  (Id. at 35.)  Plaintiff testified that, approximately

19

20   'hole,' and be left alone."  (Id., Exh. 12 at 1.)  First Level Review was bypassed.  The grievance
     was "partially granted" at the Second Level Review, because the OIA investigation was still
     pending, signed by Chief Deputy Warden Terry Rosario on behalf of Warden Pliler.  (Id., Exh.

21   12 at 2, 7; Pliler Depo. at 88.)  As framed at the Director's Level, plaintiff's appeal alleged that
     "he has been harassed by custody staff.  The appellant contends that custody staff acted in an

22   unprofessional manner and 'set him up' with narcotics.  The appellant contends that Correctional
     Officer (CO) Quist and CO Bess attempted to employ him to sell drugs to the inmate population.

23   The appellant contends that the actions of staff were unlawful. . . . [and] retaliatory.  [¶]  The
     appellant requests on appeal that an investigation takes place into the actions of both officers."

24   (Id., Exh. 14 at 1.)  The appeal was denied at the Director's Level on December 18, 2001 (id.,
     Exh. 13), with a notation that plaintiff's request for an investigation had been appropriately

25   granted in part, and was still pending (id., Exh. 14 at 3.)

26             [5]  Plaintiff was unrepresented by counsel at his May 26, 2004 deposition.

1   May 1998, Bess asked plaintiff to sell drugs on his behalf, but plaintiff refused.  (Chappell 2010
2   Depo. at 74, 75, 77.)

3              Plaintiff testified that, on the morning of October 11, 1998, when he was on the
4   yard, at about 9:45 a.m., just before yard recall, another inmate, Duane Dixon, gave plaintiff an
5   envelope.  (Chappell 2004 Depo. at 19-20.)  Plaintiff testified that Dixon told him the envelope
6   contained legal work from another inmate, "Special K" Washington.  (Id. at 15.)  Plaintiff
7   testified that, earlier that morning, he had talked with Washington about helping him in a habeas
8   corpus action, and the envelope that Dixon handed plaintiff had Washington's name on it.  (Id. at
9   14-5.)  Plaintiff stated that he accepted the envelope from Dixon in the belief that it contained
10  Washington's legal paperwork.  (Id. at 23, 24.)  Plaintiff testified that, after receiving the
11  envelope from Dixon, he went from the yard to an indoor day room, where he was paged by
12  prison staff.  Plaintiff stated that he walked over to the control booth, where he was informed that
13  he had an appointment at the medical clinic.  (Id. at 22.)  Plaintiff testified that, because he then
14  had a broken leg, he believed that the purpose of the appointment may be to remove his cast.  (Id.
15  at 14, 24.)  Plaintiff stated that, as he approached the clinic, he saw Dixon speaking with
16  defendant Quist.  (Id. at 22, 23.)

17             Plaintiff testified that, when he entered the clinic, defendant Quist ordered
18  plaintiff to enter a holding room and to strip; plaintiff complied.  (Id. at 24.)  Plaintiff testified
19  that Quist and Bess then conducted a search of plaintiff.  (Id. at 26.)  Plaintiff stated, that "the
20  first thing they took" was the envelope that Dixon had given to plaintiff.  (Id. at 27.)  Plaintiff
21  testified that Bess picked up the envelope and searched it, told Quist, "I found it," then gave the
22  envelope to Quist.  (Id. at 30, 53.)  Plaintiff testified that, in the course of the search, plaintiff
23  gave Quist an eye dropper bottle that plaintiff had been carrying in his pocket, and which
24  contained heroin residue; Quist reportedly set the bottle to the side.  (Id. at 29, 30, 33.)  Plaintiff
25  testified that, at the time of the search, he had a cast on his left leg, without a sock or shoe on that
26  foot.  (Id. at 25.)

1    Plaintiff testified that, about five hours after the search, defendants Quist and Bess

2   and a third correctional officer read plaintiff his rights and informed plaintiff that he was being

3   charged with possession of heroin.  (Id. at 41-42.)  Plaintiff stated that he later received an RVR

4   charging him with possession of several grams of heroin.  (Id. at 44.)

5    Plaintiff testified that the bindle of heroin that he was charged with possessing on

6   October 11, 1998, "wasn't mine."  (Id. at 46.)  Plaintiff contended throughout both depositions

7   that he was framed with the heroin bindle; that plaintiff is a heroin user, not a trafficker.

8    B.  Dixon's March 8, 2001 Trial Testimony

9    Inmate Duane Dixon testified as follows at plaintiff's March 8, 2001 criminal

10   trial.  (See Dkt. Nos. 212-5 (Exh. B); 213-5 (Exh. B); 214-5 (Exh. B) ("Dixon Test.").)

11    Dixon testified that he used to see plaintiff every day on the yard, including in

12   October 1998, but did not "know" plaintiff.  (Dixon Test. at 31-2, 39.)  Although Dixon could

13   not remember the exact date, he recalled that, in October 1998, he gave plaintiff a "vanilla"

14   envelope of legal work belonging to "Special K," which Dixon had obtained from Special K.

15   (Id. at 33, 35.)  Dixon testified that Bess had given him heroin to place in the envelope, and that

16   Bess had told Dixon "that he wanted Chappell off the yard, and he wanted Chappell to be setup."

17   (Id.)  Dixon stated that there were no other officers nearby when Bess handed Dixon the heroin.

18   (Id. at 40.)  Dixon testified that he placed the "drugs up in the envelope with the bottle[6] . . . and

19   gave it to Chappell.  It was all a setup. . . [t]o get Chappell off of B facility with a drug beef."

20   (Id. at 33.)  Dixon testified that this alleged setup was planned by defendant Bess; that Dixon was

21   working for Bess that day, and that Dixon was then Bess' "number one person."  (Id. at 34.)

22   Dixon testified that he "never talked to Quist.  I always talked to Bess."  (Id. at 40.)  Dixon stated

23

24    [6]  The court notes, but need not resolve at this time, the apparent inconsistency in the
     deposition testimony of plaintiff (that he carried an eyedropper bottle containing heroin residue
25   in his pocket), with the trial testimony of witness Dixon (that he placed "drugs up in the envelope
     with the bottle" before handing the envelope to plaintiff (Dixon Test. at 33).)  As set forth infra,
26   there are many inconsistencies in the testimony of the parties.

that the first time he saw Quist that day was on the yard.  (Id.)

Dixon testified that plaintiff had "no knowledge" that the drugs and bottle were in the envelope; that "[a]ll Chappell thought was in that envelope was legal work."  (Id. at 33, 34.) Dixon testified that, thereafter, "it was yard recall, and Chappell was called -- called by the CO's, and they found the dope in the vanilla envelope, which was all part of the plan."  (Id. at 34.) Dixon estimated that plaintiff was called five to ten minutes after Dixon handed him the envelope, and testified that plaintiff never looked in the envelope, and was still carrying the envelope when he was called.  (Id. at 35.)

Dixon testified that, after he gave plaintiff the envelope, "the plan was I was supposed to go back to the block, which was 1 [one] block, and pick the envelope up, but he [plaintiff] didn't make it in there because he was called to the MTA [medical technician assistants]."  (Id. at 35.)  Dixon testified that he pretended he "was going to the law library to check out a book" (id. at 37), and witnessed the following:  "I saw him [plaintiff] go through the sallyport gate.  It's like a little tunnel.  He went through the tunnel, went in there.  They put him in a little holding cell room [in the MTA room].  It was CO Bess and CO Quist.  They opened the envelope and found the drugs and . . . [t]hey . . . put him, like, in a little hallway with some cages, and they went to the program office . . . to the B facility program office," where Dixon could no longer see the officers.  (Id. at 35-7.)

Dixon testified that these events took place during "first yard . . . about ten o'clock, 10:30, something like ten, eleven o'clock."  (Id. 33)  Dixon testified that, at the time of this incident, he was housed in Facility A, Block 1.  (Id. at 38.)  Dixon testified that there were sometimes overlaps in the movements of prisoners among the CSP-SAC facilities:  "[B]y the time they get to B section, they be letting -- they be sending A section back inside.  Sometimes C section make it.  Sometimes they don't."  (Id. at 39.)

Dixon testified that he told plaintiff about the setup after "Bess got me beat up on the yard by one of my people's."  (Sic.)  (Id. at 41.)  "[B]ecause . . . CO Bess never paid me the

14

rest of my money that he owed me, so I was about to expose him.  So he went to somebody on
the yard and got me into a fight.  So they moved me to the next facility. . . ." (Id.)  Dixon
testified that he had helped setup other people, but this was the only time he set up plaintiff.  (Id.
at 38.)  Dixon testified that he was willing to set people up because he was rewarded:  "I'm a
lifer, so I was getting free TV's, free yard, radios, stuff that my people's couldn't give to me."
(Sic.)  (Id. at 39.)

C.  Quist's October 26, 2010 Deposition Testimony

Defendant Michael Quist testified that he reported to his work as a correctional
floor officer at CSP-SAC's Unit B-1, at 5:00 a.m., on October 11, 1998.  (Quist Depo. at 15, 83.)
Quist testified that, on that morning, in the area between Unit B-1 and the sallyport gate, he was
approached by inmate Gordon, who told Quist that Gordon had been informed by inmate Kiki
Williams that, if Gordon was interested in tar heroin, he should get in contact with Kiki's
cellmate, i.e., plaintiff.  Quist testified that he considered Gordon's statement reliable, because
Gordon had provided reliable information in the past.  (Id. at 22-24.)

Quist testified that he decided to search the cell occupied by plaintiff and
Williams, but was told by the control booth officer that there were problems with their cell door,
likely from the inmates blocking or jamming the door.  Quist testified that this information
underscored his suspicion that illegal activity was taking place in the cell, and that he did not
want to risk giving plaintiff an opportunity to flush contraband down the toilet by having a delay
in opening the cell door while plaintiff was inside.  Quist testified that Williams was not in the
cell at this time, and so Quist decided to have plaintiff called to medical clinic on the pretense of
examining his broken leg, in order to search plaintiff at the clinic, then hold plaintiff at the clinic
while Quist searched plaintiff's cell.  "I was going to search him just as a precautionary measure
before I went in to search for drugs within the cell itself, which is where I thought the drugs
would be." (Id. at 40.)

////

15

1      Quist testified that, after plaintiff was paged, Quist watched plaintiff exit Unit B-

2  1, then walk to the sallyport area and clinic; Quist stated that he followed immediately behind

3  plaintiff into the clinic.  Quist testified, "Right inside the clinic door, asked him to step into the

4  waiting room area."  (Id. at 48.)  Quist stated that inside the waiting room area, "[i]n the center of

5  the bench area," he conducted an "unclothed body search" of plaintiff (id. at 49), and searched

6  each article of plaintiff's clothing.  Quist testified that he stood "directly in front of [plaintiff]"

7  when he conducted the search "[i]n the front of the bench" (id. at 49, 50), stating that [plaintiff]

8  sat down to remove his shoes" [plural] (id. at 49).  Quist did not recall anyone else coming into

9  the room during his search of plaintiff.  (Id. at 56.)

10      Quist testified that he found, in plaintiff's jeans, "[a] small vial that [plaintiff]

11  identified as Muslim oil.  His ID card.  And I don't recall anything else."  (Id. at 51.)  Quist stated

12  that when he searched plaintiff's "socks" [plural], he found in one sock "what appeared to be a

13  cellophane-wrapped bindle of what I suspected was tar heroin."  (Id. at 52, 55 (Quist stated that

14  he searched "both socks," and looked at plaintiff's "sandals").)  Quist testified that he "put it [the

15  bindle] in my pocket and finished the search," (id. at 54), then "secured" plaintiff's ID card and

16  vial by "put[ing] them in my pocket also" (id. at 55-6).

17      Quist initially testified that, thereafter, he escorted plaintiff to a holding cell in the

18  sallyport.  (Id. at 56.)  However, after reviewing the RVR, Quist testified that he instead "just

19  locked [plaintiff] in the waiting room area [of the clinic] rather than in the holding cell outside.  I

20  probably did this because he did have a bad leg, so he wouldn't have to stand up; he could be

21  seated."  (Id. at 66-7.)  Quist stated that he then went to the watch office to see his program

22  sergeant, and that he "would have informed him [the program sergeant] of what I found, what I

23  suspected" (id. at 58), but did not recall having the conversation with anyone.  Quist testified that

24  he did not recall what happened after that, "[b]ut I would have waited for someone who was

25  qualified to do an NIK [Narcotics Identification Kit] test to come in and test it."  (Id.)  Quist

26  stated that defendant Bess arrived and conducted the NIK test in the back room of the watch

1    office, while Quist watched.  Quist could not recall whether anyone else was present, but

2    "[p]robably the sergeant would have been there to verify the test was done and see what the

3    results were."  (Id. at 60.)  Quist testified that the test took about five minutes "or less."  (Id.)

4    Quist stated that Bess tested only a small sample of the bindle, which was otherwise in Quist's

5    "visual or physical possession at all times."  (Id. at 61.)  Quist could not recall how long it took

6    from the time he left plaintiff in the secured area, until the NIK test was conducted.

7            Quist testified that he could not recall whether he had previously seen or spoken

8    with Bess that day.  "I probably saw him earlier in the day when I checked in, but I don't recall it.

9    It had been likely I would have."  (Id. at 59.)

10           Quist testified that, after the positive NIK test, he searched plaintiff's cell.  Quist

11   could not recall whether there was any other officer present.  Quist stated that he found no

12   contraband in plaintiff's cell.  Quist also testified that, on October 11, 1998, he was involved in a

13   cell extraction of another inmate, thus confounding his recollection of the sequence and timing of

14   events on October 11, 1998.  (Id. at 63, 79.)

15           In his RVR report, handwritten that day (signed in typed form on October 13,

16   1998) (Quist Depo. Exh. 3 (RVR Report)), Quist did not reference the eyedropper bottle.  Quist

17   testified that he excluded any reference to the bottle "[b]ecause [plaintiff] said it was Muslim oil,

18   and I knew several other inmates in the yard had similar bottles that they called the same thing."

19   (Id. at 71.)  Quist stated that he would have placed the Polaroid photographs referenced in the

20   RVR "in the evidence envelope along with the bindle."  (Quist Depo. at 69.)  However, a

21   photocopy of the log sheet on the outside of the evidence envelope notes that the envelope

22   contains only "one bindle tar heroin."  (Id. at 78-9; Exh. 5 (Evidence Log).)  Quist testified that

23   the bindle remained in his pocket until he placed it in the evidence envelope.

24           Quist testified that, also on October 11, 1998, he "filled out a confidential

25   informant paper . . . [stating] that a confidential informant had provided the information that led

26   to this.  He had been reliable, and part of what he told me had proven true."  (Quist Depo. at 71-

17

2, 101.)  The typed report is dated and signed on October 12, 1998, and states that the date of

Quist's conversation with inmate Gordon was October 10, 1998.  (Id. Exh. 4 (Confidential

Interview Report).)  Quist stated that the referenced date of his conversation with Gordon was an

error, that the conversation took place on October 11, 1998.  Quist testified that Gordon refused

to sign the report; Quist explained that "[i]t's somewhat common for inmates in general

population that provide confidential information to refuse to sign it for plausible deniability . . . ."

(Id. at 108.)  In the report, Quist recommended that plaintiff "be reassigned to alternate Level IV

housing due to this incident and his receiving a broken leg on the B Facility Yard as a result of a

fight . . . . " (Id.)  Quist explained at his deposition that this statement constituted a

recommendation that plaintiff be placed in administrative segregation.  (Quist Depo. at 76).

Quist testified that he inadvertently retained in his pocket plaintiff's eyedropper

bottle, for a period of two weeks.  Quist testified that he found the bottle after plaintiff informed

Quist, on October 25, 1998, "[t]hat he was a user, not a trafficker; that he knew who the

informant was; and that he could prove it by checking out his -- the eyedropper . . . . [He] told me

to have the Muslim oil tested." (Id. at 87-9; Exh. 6 at 7.)  Quist stated that, before his

conversation with plaintiff, he assumed that the "Muslim oil" had been returned to, and

incorporated with, plaintiff's personal property (as had plaintiff's ID), pending completion of

plaintiff's term in administrative segregation.  (Id. at 81-2.)  Quist testified that he found the

bottle at his home on October 25, 1998, "[t]hat night, when I went to wash my jumpsuits."

(Quist Depo. at 89.)  Quist stated that he had not worn this particular jumpsuit since October 11,

1998, that it had remained "[h]anging on a hook behind the door in the bedroom." (Id. at 90-1.)

Quist testified that he brought the bottle "back into work and had it tested," first informing his

program sergeant, who recommended that the bottle be tested.  (Id. at 91-2.)  Quist testified that

he did not recall telling anyone else.  (Id. at 92.)   Quist stated that, after the bottle was tested, he

placed it into evidence.  (Id. at 93-5.)  Quist testified that he memorialized the addition of the

bottle into evidence, and his two-week possession, in a "Crime/Incident Report Supplemental

Page," completed on October 26, 1998  (Id., Exh. 6 at 7), and in an "Additional Information-Incident Report," dated November 4, 1998, the latter completed at the request of Quist's Security and Investigations Captain, Mr. C. Caraway.  (Id., Exh. 8).  (Quist Depo. at 95-7.)

Quist testified that, in 1998, he knew that plaintiff helped other inmates prepare legal documents.  (Id. at 98.)  Quist testified that, had plaintiff come into the building with an envelope, the envelope would have been "looked at," but plaintiff would not necessarily have been searched; "[n]ot guaranteed, but probably, yes."  (Id. at 113.)  Quist testified, however, that plaintiff was not in possession of a manila envelope when he was searched by Quist on October 11, 1998.  (Id. at 98-9.)

Quist testified that he did not know where inmate Dixon was housed on October 11, 1998, but believed that he was assigned to Facility B's "7 or 8 Block."  (Id. at 99, 103.)  Quist testified that, prior to October 1998, he had seen Dixon "numerous times in the yard."  (Id. at 116.)

At Quist's deposition, counsel for defendant Bess introduced a document, produced by defendant Pliler, that tracked Dixon's housing.  (Id., Exh. 9.)  As recounted in Bess' deposition, the housing log indicates in pertinent part that Dixon was assigned to Facility B from April 16, 1997, to June 11, 1998, when he was transferred to Facility A; that thereafter, commencing on August 19, 1998, Dixon was transferred to Facility C, where he remained through 1998.  (Id. at 1-2.)  Thus, the housing log indicates that inmate Dixon was not housed in Facility B in October 1998, but in Facility C.  (Quist Depo. at 103-07.)

Quist retired from CDCR in 2002.  (Id. at 14, 15.)

D.  Bess' October 25, 2010 Deposition Testimony

Defendant Samuel Bess testified that, on October 11, 1998, he commenced working at 7:00 a.m., in his position as a yard officer in CSP-SAC's Facility B.  Bess testified that he first saw plaintiff in the medical area, in custody by Quist, sometime before 8:00 a.m., before the yard opened.  (Bess Depo. at 29, 82.)  Bess testified that, "[j]ust five or 10 minutes

before that," he had spoken with Quist, "in the yard in front of the canteen," for "[m]aybe five minutes." (Id. at 29, 31, 34.) Bess testified that Quist then informed him "that he [Quist] had information that an inmate in this housing unit was in possession of heroin." (Id. at 29.) Bess said that Quist referred to both plaintiff and Williams, and "asked how we would go in and search the cell without getting into a fight." (Id.) Bess did not recall their discussion concerning inmate Williams. (Id. at 63.) However, Bess testified that he and/or Quist decided to have plaintiff paged to come to the medical clinic, and that Quist thereafter "specifically had Chappell paged to the medical facility from one block [Unit B-1]." (Id. at 33.)

Bess testified that he stayed in the yard and next saw Quist in the holding area of the medical clinic with plaintiff. Bess testified that Quist then informed Bess that he had found contraband on plaintiff, and showed Bess a bindle of narcotics. Bess testified that he was not present when Quist searched plaintiff. (Id. at 90.) Bess stated that plaintiff necessarily heard this conversation because he was sitting "right there . . . within three feet." (Id. at 39.) Bess testified that a supervisor, "a sergeant," was also present, but he didn't recall his name. (Id. at 40, 43.) Bess testified, "I don't remember who specifically said what, but I know the decisions were made right there and right then, like we normally routinely make any other correctional day in this situation . . . . [i.e.] Officer Quist maintains control of the evidence, the inmate goes into a holding cell, and we start the process of reporting what had been discovered." (Id. at 41.) Bess testified that someone other than he isolated plaintiff in a holding cell within the sallyport. (Id. at 42-3, 61.) Bess stated that he thereafter conducted, in the "picture room area," "an NIK field test on the narcotics," which he recounted in a Form 837 Crime Incident Report ("Form 837"). (Id. at 50-1, 55-6.) Bess testified that, based on his experience, he suspected the substance was heroin, which was confirmed by his first test, eliminating the need for further testing. Plaintiff refused to sign the test form. (Id. at 60-1.) Bess testified that he did not know if any photographs were taken of the bindle.

////

1          Bess testified that, on October 26, 1998, Quist reported to him "that he had

2    apparently inadvertently taken an eyedropper bottle home with him on October 11th, and he

3    asked what he should do based on my correctional experience." (Id. at 47, 82, 89-90.) Bess

4    stated that he advised Quist to "[t]urn yourself in," to "[t]he lieutenant," "[i]mmediately." (Id. at

5    47.) Bess testified that he and Quist went together to the lieutenant, whom he recalled may have

6    been Vern Rendon, who instructed them to "[w]rite a report about what happened, process it as

7    evidence." (Id. at 49.) Bess testified that he conducted the NIK test on the bottle, because he

8    "was probably the only one on duty to do it that day." (Id. at 82-6.) Bess testified that Quist was

9    "probably" present during the testing, because Bess "had to take it [the bottle] from him and give

10   it back to him." (Id. at 85, 87-9.)

11          Bess testified that he did not recall that a cell extraction occurred in Facility B on

12   October 11, 1998, but was not certain; when a cell extraction occurs, the facility is generally shut

13   down, because all staff are required. (Id. at 66.)

14          Bess testified that inmate Dixon was not housed in Facility B on October 11,

15   1998. Bess testified that Dixon "was at one point a confidential informant," but after he left

16   Facility B, "he was never in a position to talk to me again." (Id. at 69.) Bess estimated that he

17   last spoke with Dixon "probably early 1998." (Id.) Bess stated that Dixon had been a reliable

18   informant "numerous" times, "more than a few" times. (Id.) Asked by plaintiff's counsel

19   whether Bess had ever "allowed him [Dixon] any additional privileges," Bess responded, "Not

20   that I can recall at this time, no." (Id. at 70.) However, Bess acknowledged that, at plaintiff's

21   trial, Bess testified that he had let Dixon stay on the yard because he was a confidential

22   informant. (Id. at 72.) Bess explained at his deposition that this privilege, a decision made by

23   Bess' supervisor, was due to Dixon's status as a "crip affiliant," who provided confidential

24   information about disruptive group activities, including weapons and other contraband. (Id. at

25   72-3.) Bess testified that, at the time, all staff were informed by a "[g]eneral body memo to all

26   staff," "drafted by the yard sergeant at the captain's approval," that Dixon "was to be allowed

21

greater privileges." (Id. at 79-80.)  Bess also acknowledged his testimony at plaintiff's trial that

Dixon was allowed to go to all of the yards, specifically, that Dixon was "allowed to attend all

three yards" (i.e. three yard periods per day) "[w]ithin B facility," later described as "the yard in

the facility [where] he [was] housed." (Id. at 77-8.)  Bess testified that Dixon was also permitted

to record inmates' participation in the "Thousand Mile Club," a charity that raised money in part

by inmates walking track laps. (Id. at 80-1.)

E. Pliler's October 21, 2010 Deposition Testimony

Pliler was CSP-SAC Warden during the relevant period.  In her deposition

testimony, Pliler initially addressed her response to plaintiff's Request for Admission No. 4, in

which Pliler "denied" that, as warden, she "supervised the work of all [CSP-SAC] correctional

officers." (Pliler Depo., Exh. 1.)  Pliler explained that, as warden, she was "six times removed

from correctional officer staff." (Pliler Depo. at 13, 103.)  Pliler stated that the chain of

command was correctional officer, sergeant, lieutenant, captain, assistant warden, chief deputy

warden, warden.  However, Pliler conceded that, "through the chain of command, yes, I was

probably responsible for everything that happened there." (Id. at 13-4, 17.)  Pliler testified that

she had authority to discipline, terminate, or change the assignments of correctional officers,

provided she adhered to applicable rules and procedures. (Id. at 103-4.)  Pliler testified that she

was responsible for providing training to staff, and would have become aware if a staff member

failed to attend training; she stated that neither Bess nor Quist came to her attention for failure to

attend training. (Id. at 15-6.)

Pliler testified that the CSP-SAC Investigative Services Unit ("ISU") was under

the Warden's control, but not the Office of Internal Affairs ("OIA").  Pliler stated that both units

have responsibility for investigating alleged staff misconduct, but only the ISU investigates

alleged felony conduct by inmates. (Id. at 18-20.)  Pliler stated that CSP-SAC had a

Memorandum of Understanding ("MOU") with the DA, requiring that all felonies allegedly

committed by CSP-SAC inmates be referred to the DA for criminal prosecution. (Id. at 22-24,

37.)

Pliler testified that she did not see or review the pertinent Incident Report/Form 837, prepared by Lieutenant Hahn, and signed by Chief Deputy Warden Terry Rosario, on behalf of Pliler, on October 19, 1998.  (Id. at 26-31; Exh. 3.)  The Form 837 stated that the amount of heroin contained in the bindle confiscated from plaintiff was "a greater quantity than required for personal use.  This indicates Chappell meets the criteria as a distributor rather than a consumer." (Id., Exh. 3.)

Pliler was asked to identify each of three letters that plaintiff wrote to Pliler in November 1998.  (Pliler Depo., Exhs. 5-7.)  As to each letter, Pliler stated that she likely did not see, before this litigation, the actual letters submitted into evidence, but may have seen other copies when they were sent by plaintiff, and saw copies of all the letters on December 1, 1998.

In his first letter to Pliler, dated November 2, 1998, plaintiff requested that the eyedropper bottle be put into evidence, because it would prove that plaintiff was a drug user, not a drug trafficker, and its absence demonstrated that "your c/o's tampered with evidence."  (Id., Exh. 4.)  Plaintiff stated therein that, on October 25, 1998, he had asked Quist why the eyedropper bottle hadn't been put into evidence; that Quist had acted surprised; that Quist responded, "Well, I'll have to go get that out of your property and throw that away, won't I?" (Id.)  Although the letter was date-stamped by the Warden's office, Pliler testified that all such mail was so stamped.  (Id. at 38.)  Pliler testified that, had she read this copy of the letter, she would have initialed it or written a note on it; neither notation are on the letter.  (Id. at 37-8.) Pliler testified that the letter was apparently processed by staff as a citizen's complaint.  (Id. at 39-41).  Although a responsive letter, dated November 4, 1998, was sent to plaintiff under Pliler's typed name, Pliler testified that the response was likely prepared by the ISU secretary, and Pliler did not review the letter before it was sent to plaintiff.  (Id. at 41-46.)  The responsive letter states that an inquiry was conducted by the ISU, that a NIK test of the liquid in the dropper tested positive for heroin, that a supplemental report was prepared, and that the dropper and

1   remaining liquid were processed into evidence.  (Id., Exh. 5)

2          In his second letter to Pliler, dated November 14, 1998, plaintiff stated that the

3   eyedropper bottle had never been part of plaintiff's confiscated property, and thus that Quist's

4   statements to the contrary indicated that "not only are your officer's lying and tampering with

5   evidence, but they are also falseying legal document's for purpose of adverse actions ." (Sic.)

6   (Id., Exh. 6.)  Pliler noted that this letter bears a date-stamp of November 17, 1998, and a

7   handwritten notation that provides, "rec'd" which was apparently written by the ISU secretary,

8   "Dominique."  (Id.)  Pliler did not recall seeing the document before preparing for this litigation,

9   and noted that it did not bear a date-stamp from the Warden's office.  (Pliler Depo. at 47-9.)

10          In his third letter to Pliler, dated November 21, 1998, plaintiff again alleged

11  "misconduct" by Quist, specifically "falsifying legal documents/conspiracy," and alleged that

12  Pliler's failure to appropriately respond indicated that Pliler may be part of the alleged conspiracy

13  against him.  (Id., Exh. 7.)  The letter bears a date-stamp of November 23, 1998, and a

14  handwritten notation that includes "rec'd" and "To [Captain] Caraway."  (Id.)  Pliler testified that

15  the handwritten notation appeared to be written by "Dominique," the ISU secretary, and that she

16  did not recall seeing the letter before this litigation.  (Pliler Depo. at  50-2.)

17          Pliler testified that she did sign a memorandum addressed to plaintiff, dated

18  December 1, 1998, and entitled "Correspondence Relevant to Incident Report Log #SAC-FAB

19  98-10-0503."  (Pliler Depo. at 53, Exh. 8.)  In that memo, Pliler references plaintiff's letters

20  received on November 17 and November 23, 1998; rejects plaintiff's contention that the

21  challenged search was the result of a conspiracy; states that "the report submitted by Quist was

22  honest;" informs plaintiff that the matter was referred for criminal prosecution on November 13,

23  1998; and informs plaintiff that Pliler would answer no further questions, and any additional

24  communications should be made to Captain McKay through the administrative grievance

25  process.  (Id., Exh. 8.)  Pliler testified that she didn't author the December 1, 1998 memo, which

26  was prepared by the ISU staff.  However, she stated that plaintiff's letters received on November

17 and 23, "would have been included in the correspondence package that would have come up with this response dated December 1," and that Pliler "would have" read them at that time, as well as Quist's supplemental report.  (Pliler Depo. at 53-66.)

Pliler next testified about the administrative grievances plaintiff filed in 2001, after his acquittal, which alleged misconduct by Bess, Quist, and Pliler, and sought expungement of plaintiff's disciplinary conviction and reinstatement of his privileges.  The first grievance, filed April 24, 2001, was "partially granted" at the Second Level based on the initiation of an investigation by the ISU, at the request of the Acting Chief Deputy Warden A.K. Burruel, who signed the Second Level Response on behalf of Warden Pliler.  (Pliler Depo., Exh. 9; see also n.3, supra.)  The second grievance, filed June 7, 2001, added a claim that plaintiff was retaliated against after filing the March grievance.  (Id., Exh. 12; see also n.4, supra..)  The June grievance was "partially granted" at the Second Level Review, based on the initiation of an investigation by the OIA; the response was prepared by Burruel, then Associate Warden of Administrative Segregation, and signed by Chief Deputy Warden Terry Rosario, on behalf of Warden Pliler. Pliler testified that she "likely [did] not" review either of these documents at the time, because they do not bear her signature, and because she and the Chief Deputy Warden routinely reviewed different "stacks" of administrative grievances.  (Pliler Depo. at 78-90.)  Both the April and June 2001 grievances were denied at the Third Level Review.  (Id.)

At her deposition, Pliler identified two computerized prisoner housing logs, the first a summary of plaintiff's housing (Pliler Depo., Exh. 15), the second a summary of inmate Dixon's housing (id., Exh. 16).  Piler testified that the first log indicated that plaintiff was moved from Facility B to administrative segregation on October 11, 1998 (Pliler Depo. at 92-3), while the second log indicated that inmate Dixon was housed in CSP-SAC's Facility C on October 11, 1998.  (Id. at 93-4.)  Pliler testified that inmates may move temporarily from one facility to another for purposes of obtaining medical care or pursuant to an investigation, but they are escorted.  (Id. at 94-6.)  Pliler testified that some inmates acted as confidential informants, but

25

1   none were permitted access to yards outside of their own facility absent a medical need and/or

2   under escort.  (Id. at 96-102.)  Pliler described the facilities as "self-contained," with

3   "[p]hysically different yards, physically different dining rooms, physically different gyms."  (Id.

4   at 101.)  Pliler testified that she had no personal knowledge whether Dixon acted as a

5   confidential informant.  (Id. at 96.)

6   VII.  Discussion

7          A.   Exhaustion of Administrative Remedies

8                  Pursuant to plaintiff's demonstration that he exhausted his administrative

9   remedies relative to his heroin possession disciplinary charge (Dkt. No. 212 at 10-11, and

10  exhibits cited therein), defendant Quist, in reply, has withdrawn his contention that these claims

11  should be dismissed for failure to exhaust administrative remedies (Dkt. No. 216 at 1).

12         B.   State Law Malicious Prosecution Claim

13                 Plaintiff states that he lacks evidence to support his assertion that he timely filed a

14  claim with the California Government Claims Board, pursuant to California Government Code

15  sections 810 et seq.  (See e.g. Dkt. No. 214 at 10.)  Due to plaintiff's inability to demonstrate

16  compliance with the California Tort Claims Act, the court grants defendants' motions for

17  summary adjudication of plaintiff's state law claim for malicious prosecution.[7]

18         C.   Eighth Amendment Claim

19                 Plaintiff concedes that his factual allegations do not state an Eighth Amendment

20  claim (Dkt. No. 212 at 12; Dkt. No. 214 at 10), as previously determined by the court (Dkt. No.

21  107; Dkt. No. 104 at 4-5).  Accordingly, defendants' motions for summary judgment on this

22  claim are granted.

23  ////

24  _____

25         [7]  This court previously dismissed plaintiff's additional state law claims, under the
    California Penal Code, for lack of a private right of action.  (See Findings and Recommenda-
    tions, filed March 8, 2006 (Dkt. No. 104 at 5); Order adopting Findings and Recommendations,
26  filed April 10, 2006 (Dkt. No. 107).)

1    D.  <u>Damages Limitations</u>

2            Defendants contend, and plaintiff concedes, that the Prison Litigation Reform Act

3    ("PLRA") precludes plaintiff from recovering damages based solely on plaintiff's alleged mental

4    or emotional distress, due to plaintiff's lack of alleged physical injury.  (<u>See</u> Dkt. No. 212 at 17-

5    8.)  The PLRA provides in pertinent part that, "[n]o Federal civil action may be brought by a

6    prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury

7    suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).

8    The Ninth Circuit Court of Appeals has construed this provision to preclude recovery of damages

9    for mental or emotional injuries unless the prisoner has suffered a physical injury that is more

10   than de minimis.  <u>Oliver v. Keller</u>, 289 F.3d 623, 626-28 (9th Cir. 2002).

11           Nevertheless, plaintiff may seek damages premised on the alleged violation of his

12   federal constitutional rights.  "The deprivation of [federal constitutional] rights entitles a plaintiff

13   to judicial relief wholly aside from any physical injury he can show, or any mental or emotional

14   injury he may have incurred."  <u>Cannell v. Lightner,</u> 143 F.3d 1210, 1213 (9th Cir. 1998).  "To the

15   extent that [plaintiff] has actionable claims for compensatory, nominal or punitive damages –

16   premised on violations of his Fourteenth Amendment rights, and not on any alleged mental or

17   emotional injuries – we conclude the claims are not barred by § 1997e(e)."  <u>Oliver</u>, <u>supra</u>, 289

18   F.3d at 630.

19           Accordingly, the court grants defendants' motions for summary adjudication of

20   plaintiff's damages claims to the extent that such claims are premised solely on plaintiff's alleged

21   mental or emotional distress or injury.  Plaintiff may nonetheless pursue nominal, compensatory,

22   and punitive damages, based on the alleged violation of plaintiff's federal constitutional rights.[8]

23   ─────────────────

24        [8]  Defendant Quist argues in reply (Dkt. No. 216 at 8-9) that plaintiff is precluded from
     pursuing compensatory and/or punitive damages because his claim for compensatory damages,
     set forth in the Amended Complaint, is premised solely on plaintiff's alleged "mental anguish."
25   (AC, Prayer for Relief.)  The court does not construe plaintiff's claims for relief so narrowly.
     While plaintiff recounts with some detail his alleged emotional distress (due, in part, to his
26   asserted diagnosis of "schizophrenia with psychotic traits," and because a conviction on the

1     E. <u>Defendant Pliler</u>

2     a. <u>Plaintiff's Allegations Against Defendant Pliler</u>

3     Counsel for defendant Pliler seeks summary judgment on all claims against the

4 Warden.  As set forth in the Amended Complaint, plaintiff alleges that defendant Pliler's role

5 was to "over see the safe and smooth running of this prison for the Director of the California

6 Department of Corrections. . . . [and to be] responsible for the safe keeping of prison's/and bad

7 officer's." (Sic.)  (AC at ¶ 6.)  Plaintiff alleges that Warden Pliler was "responsible for the safety

8 of those prisoners, even from those officer's who will vindictively and maliciously plant

9 contraband/drug's on inmates and falsefy legal document's (CDC 115/Rules Violations Reports),

10 for adverse action." (Sic.)  (<u>Id.</u> at ¶ 32.)  The complaint alleges that plaintiff "wrote numerous

11 notes" to Warden Pliler shortly after the October 11, 1998 incident, informing her that Quist and

12 Bess had planted drugs on him; that, at plaintiff's suggestion, Quist had taken from plaintiff a

13 bottle plaintiff used for snorting drugs, demonstrating that plaintiff was a drug user, not a drug

14 trafficker; and that Quist had not timely submitted the bottle into evidence.  (<u>Id.</u> at ¶¶ 30-1

15 (internal punctuation omitted).)  The complaint alleges that, despite these communications,

16 "[d]efendant Pliler, rather than protect plaintiff from these defendants (one of whom has been

17 investigated for drug's/trafficking himself (6) times) rather than look into this, defendant Pliler

18 sent the letter that plaintiff sent (confidential legal mail) . . . to the district attorney, to use as

19 evidence against plaintiff and aid the criminal acts committed against plaintiff by defendant[]

20 Pliler's officers, already." (Sic.)  (<u>Id.</u> at ¶ 33 (internal punctuation omitted).)

---

criminal charge would have been plaintiff's "third strike," subjecting him to a possible life
sentence), his reference to "mental anguish" in support of his compensatory damages claim is,
literally, parenthetical (<u>see id.</u>), and not further referenced in support of his claims for punitive
and exemplary damages.  Because this court is required to liberally construe plaintiff's pleadings
and motion papers, the undersigned is disinclined to make a preclusive damages ruling at this
stage of the litigation.  <u>See e.g.</u> <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010)
(affirming that "courts should construe liberally motion papers and pleadings filed by pro se
inmates and should avoid applying summary judgment rules strictly").  Rather, if plaintiff is able
to support his damages claims without relying solely on his alleged emotional injuries, then
plaintiff should be entitled to recover.

1    Elsewhere in the complaint (in support of his Eighth Amendment claim,

2  dismissed herein), plaintiff relies on Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir.

3  1989), for the principle that "supervisory liability may be imposed when an official has actual or

4  constructive notice of unconstitutional practices and demonstrates 'gross negligence' or

5  'deliberate indifference' by failing to act" (AC at ¶ 38),[9] and contends (id.):

6          Defendant Pliler has a responsibility to protect plaintiff from harm,
           and from those subordinate officers who will abuse their authority
7          against an inmate.  Plaintiff gave this defendant enough evidence
           that would raise the suspicion of any professional, and would've
8          sought the truth.  Rather than do that, defendant Pliler sent the
           letter plaintiff had sent to this defendant (confidential legal mail),
9          to the county district attorney, to aid these officer's (sic)
           misconduct and the (DA's) prosecuting those false charges/and the
10         fact that those officer's (sic) planted that evidence.

11    In his opposition to defendant Pliler's motion for summary judgment, plaintiff

12  argues that there remain disputed issues of material fact concerning the alleged failure of Pliler

13  "to adequately supervise, train, and control Officers Bess and Quist to prevent their violation of

14  Chappell's due process rights" (Dkt. No. 214 at 9); that, viewing the evidence in the light most

15  favorable to plaintiff, a jury could reasonably find "Pliler liable for culpable inaction in training,

16  supervision, and control that permitted such a state of affairs to arise in her prison" (id.); and

17  "that Pliler failed to control her subordinates so as to prevent such constitutional violations from

18  occurring -- a deliberate indifference rendering her personally liable, and directly responsible, for

19  the harm accruing to Chappell" (id. at 10).

20          b. Legal Standards for Supervisory Liability

21    Supervisory liability may be imposed in an individual capacity only when the

22  supervisor participated in or directed the violations, or knew of the violations of subordinates and

23  failed to act to prevent them.  Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009).  "Under

24

25    [9] Plaintiff's further citations to Hoptowit v. Ray, 682 F.2d 1237, 1249-51 (9th Cir. 1982),
    and Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987), are inopposite.

26

1    Section 1983, supervisory officials are not liable for actions of subordinates on any theory of

2    vicarious liability.  A supervisor may be liable if there exists either (1) his or her personal

3    involvement in the constitutional deprivation, or (2) a sufficient causal connection between the

4    supervisor's wrongful conduct and the constitutional violation."  Hansen v. Black, 885 F.2d 642,

5    645-46 (9th Cir. 1989) (citations omitted).  Thus, "[a]lthough there is no pure respondeat

6    superior liability under § 1983, a supervisor is liable for the acts of his subordinates 'if the

7    supervisor participated in or directed the violations, or knew of the violations [of subordinates]

8    and failed to act to prevent them.'"  Preschooler II v. Clark County School Bd. of Trustees, 479

9    F.3d 1175, 1182 (9th Cir. 2007), quoting Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

10   Facts consistent with at least one of these scenarios must be specifically alleged in order to state a

11   cognizable claim against a supervisory defendant.

12              c.  Discussion

13              Plaintiff's evidence fails to demonstrate that his November 1998 letters to

14   defendant Pliler reasonably put the Warden on notice of the alleged misconduct of defendants

15   Quist and Bess; plaintiff's evidence also fails to demonstrate any causal connection between

16   these defendants' alleged misconduct and Pliler's allegedly inadequate supervision.  While the

17   three letters plaintiff wrote to Pliler in November 1998 allege that the evidence against plaintiff

18   had been "tampered with," and that Quist and unnamed others had lied and falsified legal

19   documents, plaintiff's letters do not contain any allegations that would necessarily distinguish

20   them from other inmate communications to the Warden in which prisoners proclaimed their

21   innocence and alleged wrongful conduct by staff.  Moreover, the letters contain plaintiff's

22   concession that he had used the confiscated bottle to snort drugs, a clearly proscribed activity.

23   Additionally, plaintiff's letters accused only defendant Quist, not Bess.

24              Although Pliler concedes that she was, during the relevant time, responsible for

25   the correspondence to and from the Warden's office, Pliler asserts that she likely did not read

26   plaintiff's November 1998 letters until she signed her responsive memorandum dated December

1, 1998.  That memorandum acknowledges plaintiff's allegations and sets forth Pliler's response

that Quist's supplemental report "was honest," and that plaintiff's allegations of a conspiracy

were "totally unjust and without merit." (Pliler Depo., Exh. 8.)  While these statements appear to

be overstated, they do not suggest a cover-up.  Pliler further noted that, because both the subject

bottle and bindle tested positive for heroin, ISU Captain McKay had referred the case to the DA

on November 13, 1998, for criminal prosecution.  (Id.)  Pliler testified that this referral was

mandatory pursuant to a Memorandum of Understanding between CSP-SAC and the Sacramento

County DA.  (Id. at 22-24, 37.)  Plaintiff's allegations that this referral hinged on the

"confidential information" he had provided Pliler, and demonstrates Pliler's alleged participation

in a conspiracy against plaintiff, are not reasonably supported by the evidence.

Finally, although not submitted in admissible form, attachments to the complaint

include several memoranda, apparently prepared by an investigator in preparation for the

criminal prosecution against plaintiff, which reflect the alleged statements of several inmates,

including Dixon, that defendant Bess had routinely sold drugs to inmates, planted drugs on

inmates, instigated fights among inmates, and was generally considered to be dishonest and

retaliatory against inmates who refused to cooperate with him.  (See AC, Exhs. A-D.)  None of

these statements names or implicates Pliler.  Moreover, despite an opportunity to do so,

plaintiff's counsel did not move to reopen discovery (e.g., pursuant to Federal Rule of Civil

Procedure 56(d)), in order to discover admissible evidence or lay a foundation for asserting that

Bess' alleged misconduct was consistent with a pattern or practice of which the Warden should

reasonably have been aware, either prior to October 11, 1998, or within a reasonable period

thereafter.

For these reasons, the court finds that the only pertinent inference reasonably

drawn from the evidence is that defendant Pliler was put on notice of possible misconduct by

defendants Quist and Bess only after plaintiff's acquittal on the related criminal charges in 2001.

////

1   Accordingly, defendant Pliler's motion for summary judgment is granted in full,

2   and Pliler is dismissed from this action.

3   F.   Conspiracy

4   Defendant Quist moves for summary judgment on plaintiff's claim that Quist and

5   Bess conspired to deprive plaintiff of his civil rights.[10]  (See Dkt. No. 197-1 at 16-18.)  Defendant

6   Bess does not address this issue.

7   A conspiracy claim brought under Section 1983 requires proof of "'an agreement

8   or 'meeting of the minds' to violate constitutional rights," Franklin v. Fox, 312 F.3d 423, 441

9   (9th Cir. 2001), quoting United Steel Workers of Amer. v. Phelps Dodge Corp., 865 F.2d

10   1539,1540-41 (9th Cir.), cert. denied, 493 U.S. 809 (1989) (citation omitted), as well as an

11   "'actual deprivation of constitutional rights resulting from the alleged conspiracy,'" Hart v.

12   Parks, 450 F.3d 1059, 1071 (9th Cir. 2006), quoting Woodrum v. Woodward County, Okla., 866

13   F.2d 1121, 1126 (9th Cir. 1989) (citations omitted).  "'To be liable, each participant in the

14   conspiracy need not know the exact details of the plan, but each participant must at least share

15   the common objective of the conspiracy.'"  Franklin, 312 F.3d at 441, quoting United Steel

16   Workers, 865 F.2d at 1541.  A complaint must "allege specific facts to support the existence of a

17   conspiracy among the defendants."  Buckey v. County of Los Angeles, 968, 791, 794 (9th Cir.

18   1992); Karim-Panahi v. Los Angeles Police Department, 839 F.2d 621, 626 (9th Cir. 1988).

19   Plaintiff must allege that defendants conspired or acted jointly in concert and that some overt act

20   was done in furtherance of the conspiracy.  Sykes v. State of California, 497 F.2d 197, 200 (9th

21   Cir. 1974).

22   ////

23

24   [10]  The court overrules defendant Quist's objections to the admissibility of some of
plaintiff's alleged facts in support of his conspiracy claim.  (See e.g. Dkt. No. 218; Dkt. No. 216
25   at 2).  The admissible facts in this action, viewed in the light most favorable to plaintiff, support
a reasonable inference that defendants Quist and Bess conspired to deprive plaintiff of his
26   constitutional rights.  The disputed facts will be resolved at trial.

1          Defendant Quist asserts that plaintiff failed to provide any material factual

2   evidence in support of his conspiracy claim, specifically, that plaintiff produced no evidence to

3   refute Quist's deposition testimony that he searched plaintiff only in response to a tip provided

4   him by informant inmate Gordon, who had been told by plaintiff's cellmate, Kiki Williams, that

5   plaintiff was in possession of tar heroin.  (Dkt. No. 197-1 at 17.)  However, as fully set forth

6   herein, the record includes ample evidence that refutes Quist's testimony, including the trial

7   testimony of Dixon, and the deposition testimony of plaintiff.

8          Moreover, the deposition testimony of defendants Quist and Bess differ in

9   significant respects.  For example, Bess specifically recalled talking with Quist on the morning of

10  October 11, 1998, for about "five minutes," "in the yard in front of the canteen," "just five or ten

11  minutes before" he saw plaintiff in Quist's custody (Bess Depo. at 29, 31, 34), while Quist had

12  no recollection of talking with Bess before searching plaintiff (Quist Depo. at 59).  Similarly,

13  Bess recalled that Quist consulted first with Bess regarding how best to proceed with the newly-

14  discovered dropper bottle (Bess Depo. at 47, 82, 89-90), while Quist recalled that he discussed

15  this matter only with his program sergeant (Quist Depo at 91-2).  Additionally, Bess conceded at

16  his deposition that Dixon had been a reliable informant "numerous" times, and was allowed

17  greater privileges than other inmates, including the freedom to "attend all three yards."  (Bess

18  Depo. at 69, 72-3, 77-81.)  Viewed in the light most favorable to plaintiff, this testimony suggests

19  that Quist may have tried, at his deposition, to cover up his relevant communications with Bess,

20  and, therefore, that defendants Quist and Bess conspired together, and with Dixon, to plant false

21  evidence on plaintiff, then execute a staged search of plaintiff.  Whether defendants Quist and

22  Bess conspired to deprive plaintiff of his civil rights, by framing him with a fabricated drug bust,

23  remains a material factual dispute that cannot be resolved on summary judgment.

24          Defendant Quist's motion for summary judgment on plaintiff's conspiracy claim

25  is therefore denied.  Plaintiff's conspiracy claim against defendants Quist and Bess shall proceed

26  to trial.

1     G.  Equal Protection

2          Defendants move for summary judgment on plaintiff's equal protection claim.

3     As framed by plaintiff's counsel at the hearing, and in opposition to defendants' motions for

4     summary judgment, this claim does not assert that plaintiff is a member of a suspect class.

5     Rather, plaintiff asserts that he was "singled out" from similarly situated inmates when

6     defendants Bess and Quist allegedly framed plaintiff in retaliation for plaintiff's refusal to

7     participate in illegal conduct with Bess, and that these facts support an equal protection claim

8     premised on a "class of one" theory.

9          "The Equal Protection Clause of the Fourteenth Amendment commands that no

10    State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

11    essentially a direction that all persons similarly situated should be treated alike." City of

12    Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S.

13    202, 216 (1982)).  Where state action does not implicate a suspect classification, a plaintiff can

14    establish an equal protection claim under a "class-of-one theory" by demonstrating that he was

15    intentionally and irrationally "singled out" from others who were similarly situated.  Engquist v.

16    Oregon Department of Agriculture, 553 U.S. 591, 601-02 (2008); Village of Willowbrook v.

17    Olech, 528 U.S. 562, 564 (2000).  An equal protection claim may be brought by a "'class of one,'

18    where the plaintiff alleges that [he] has been intentionally treated differently from others

19    similarly situated and that there is no rational basis for the difference in treatment." Olech, 528

20    at 564.  To state a claim as a class of one, a plaintiff must identify the group of individuals with

21    whom he is similarly situated, and identify his allegedly intentional and disparate treatment.

22    McCollum v. California Dept. of Corrections and Rehabilitation, 647 F.3d 870, 880-81 (9th Cir.

23    2011) (plaintiff must answer "the basic question of who, what, where, and how" in support of his

24    equal protection claim) (citation and internal quotations and punctuation omitted).  Stated

25    differently:

26    ////

> The "class of one" theory was recognized in Olech, and is unusual
> because the plaintiff in a "class of one" case does not allege that
> the defendants discriminate against a group with whom she shares
> characteristics, but rather that the defendants simply harbor animus
> against her in particular and therefore treated her arbitrarily.  See
> N. Pacifica LLC v. City of Pacifica, 526 F.3d 478, 486 (9th Cir.
> 2008) ("When an equal protection claim is premised on unique
> treatment rather than on a classification, the Supreme Court has
> described it as a 'class of one' claim." (citing Olech, 528 U.S. at
> 564, 120 S. Ct. 1073)).  Such circumstances state an Equal
> Protection claim because, if a state actor classifies irrationally, the
> size of the group affected is constitutionally irrelevant.  Olech, 528
> U.S. at 564, 120 S. Ct. 1073.

Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 592 (9th Cir. 2008).

Defendants respond that the evidence fails to demonstrate that plaintiff was treated "in a patently arbitrary way which bears no rational relationship to a legitimate government interest."  (Dkt. No. 197-1 at 14; see also Dkt. No. 200 at 19 ("[p]laintiff's rationale that defendant treated him differently than other prisoners is baseless and without merit").) Defendants' argument is premised on the principle that an authorized, discretionary decision by a government employee, though impacting only one person, is generally not subject to an equal protection challenge.[11]  This argument appears to focus on the search of plaintiff, which

_____

[11]  The Supreme Court has declined to extend the "class of one" equal protection theory to public employment decisions, largely because such decisions "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." Engquist , supra, 553 U.S. at 603.  The Court reasoned that, "[i]n such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." Id.
    Despite the Supreme Court noting a "crucial difference" between the greater discretion accorded a government acting as employer, rather than sovereign, Engquist at 598-99, several courts have relied on Engquist to preclude application of the "class of one" equal protection theory to broader categories of authorized governmental decisions that are inherently individualized and discretionary.  See e.g. United States v. Moore, 543 F.3d 891, 901 (7th Cir. 2008) (rejecting application of "class of one" equal protection theory to prosecutorial discretion, because "the discretion conferred on prosecutors in choosing whom and how to prosecute is flatly inconsistent with a presumption of uniform treatment"); Flowers v. City of Minneapolis, 558 F.3d 794, 799-800 (8th Cir. 2009) (rejecting application of "class of one" equal protection theory to the investigative decisions of police officers); Adams v. Meloy, 287 Fed. Appx. 531, 534 (7th Cir. 2008) (rejecting application of "class of one" equal protection theory to parole board decisions); Towery v. Brewer, 2012 WL 592749, *12 (D. Ariz. 2012) (in rejecting a challenge to Arizona's lethal-injection protocol by two death-row inmates, the court found in

defendants contend was reasonable, as an officially authorized and discretionary decision, based on a reasonable suspicion of wrongdoing, which necessarily impacts one prisoner at a time.

However, in the present case, plaintiff alleges that, despite the official imprimatur of the challenged search, the subject evidence had been planted on plaintiff and the ensuing search of plaintiff staged, these actions motivated by, and carried out with, malice against plaintiff, with an intent to harm him.  Plaintiff alleges that any alleged rational basis for the search is pretextual.

The court finds that plaintiff's allegations support application of a "class of one" equal protection theory to the facts of this case.  The appropriate reference group encompasses all inmates housed at CSP-SAC during the relevant period.[12]  All California inmates are similarly situated in their fundamental right to be free from official coercion to engage in illegal conduct, and their right to refuse participation in such conduct without incurring official retaliation. Inmates subject to such retaliation are necessarily "singled out" from the general inmate population, both intentionally and irrationally.  Engquist, supra, 553 U.S. at 601-02; Olech, 528 U.S. at 564.  Such retaliatory conduct is motivated by personal animus, Behrens, supra, 546 F.3d

---

pertinent part that the prison's "the class-of-one equal protection theory has no place 'in the context of prison officials making discretionary decisions concerning inmates'") (quoting Dawson v. Norwood, 2010 WL 2232355, *2 (W.D. Mich. 2010) (rejecting application of "class of one" claim to inmate's challenge to prolonged confinement in administrative segregation (collecting cases)); Hamer v. El Dorado County, 2011 WL 794895, *10-13 (E.D. Cal. 2011) (rejecting "class of one" equal protection claim premised on plaintiffs' wide-ranging allegations that "appear[ed] to contend that defendants' fail[ed] to provide them with police services, code enforcement services, and access to their political representatives in a non-discriminatory way and . . . [made] alleged false statements regarding plaintiffs' arrest," noting further that "[t]he allegation that defendants made false statements regarding plaintiffs' arrest in violation of plaintiffs' equal protection rights . . . is contradicted by the exhibits attached to plaintiffs' complaint"); but see Solis v. Fresno Police Department, 2011 WL 3568889, *7-8 (E.D. Cal. 2011) (dismissing with leave to amend plaintiff's claims that police officers "discriminated against, singled out and failed to treat Plaintiff like other individuals accused of similar crimes" (quoting the complaint)).

[12]  The court rejects too narrow a reference group, e.g., inmates who refused to sell narcotics for defendant Bess or, more generally, inmates who refused a correctional officer's request to engage in illegal activity.

at 592, and is therefore arbitrary, City of Pacifica, supra, 526 F.3d at 486.  The reality that

prisoners other than plaintiff may be targeted by such retaliatory conduct does not undermine

application of the "class of one" theory herein.  "[T]here is no requirement that the challenged

government action single out one solitary person.  As the Court explained in Olech, '[w]hether

the complaint alleges a class of one or of five is of no consequence because we conclude that the

number of individuals in a class is immaterial for equal protection analysis.'"  Franks v.

Rubitschun, 312 Fed. Appx. 764, 766 n.2 (6th Cir. 2009), quoting Olech, supra, 528 U.S. at 564

n.* (asterik in original).

Plaintiff's factual allegations appear to be analogous to those of the plaintiff in

Franks v. Rubitschun, supra, 312 Fed. Appx. 764, also premised on a charge of official

fabrication, where the Court of Appeals found a potentially cognizable "class of one" equal

protection claim.  As framed by the Sixth Circuit, in remanding the issue to the district court for

its consideration in the first instance:

> As we understand it, Franks's argument on appeal is that his
> complaint, leniently construed, states a class-of-one claim as
> follows:  Michigan's policies do not permit members of the parole
> board knowingly to insert falsified information into a prisoner's
> parole file, nor do they permit members to base a denial of parole
> on such information. The parole board has deviated from this
> policy, however, in its treatment of Franks, and it has done so on
> the basis of personal animus, rather than on any rational basis.

Franks, at 766.  In Franks, as in the instant case, a "class of one" theory appeared to the Sixth

Circuit Court of Appeals to apply to circumstances where officials allegedly relied on known

false information to support an otherwise authorized official act, thereby tainting the official

action.[13]

---

[13]  This court notes that, on remand, the district court in Franks v. Rubitschun rejected
application of the "class of one" theory.  However, unlike the instant case, the court found in
pertinent part that plaintiff had failed to introduce evidence supporting his claim that the parole
board acted with personal animus toward plaintiff by inserting allegedly false information in his
prison file.  See Franks v. Rubitschun, 2010 WL 1424253, *10 (W.D. Mich. 2010).  Rather, the
district court determined that the parole board acted within its authority to make "inherently

1    This court emphasizes, however, that plaintiff's subsequent acquittal on related

2    criminal charges distinguishes this case from others in which an inmate alleges improper motive

3    for an otherwise authorized act.  Subject to this narrow construction,[14] the court finds that the

4    available evidence supports each element of a "class of one" equal protection  claim in the instant

5    case.  Like all prisoners at CSP-SAC, plaintiff was entitled to be free of official coercion to

6    engage in illegal conduct, and to be free of official retaliation for declining to participate.

7    Plaintiff alleges that, when he refused Bess' invitation to sell drugs on Bess' behalf, that

8    defendant Bess, together with defendant Quist, retaliated against plaintiff by planting evidence on

9    him and conducting a staged search of plaintiff, pursuant to which defendants "found" the

10   planted evidence, which led to unwarranted administrative and criminal proceedings against

11   plaintiff and his prolonged detention in administrative segregation.  The court finds that these

12   allegations assert the requisite intentional and irrational "singling out" of plaintiff, Engquist, 553

13   U.S. at 601-02; Olech, 528 U.S. at 564, and answer "the basic question of who, what, where, and

14   how," in support of plaintiff's "class of one"  equal protection claim, McCollum, supra, 647 F.3d

15   at 880-81(citation and internal punctuation omitted).

16           For these reasons, the court denies defendants' motion for summary judgment on

17   plaintiff's "class of one" equal protection claim, which shall proceed to trial against defendants

18   Bess and Quist.

19   ////

20

21   discretionary decision[s] that involve[] subjective individual-specific determinations," and relied
     on valid and supported reasons in repeatedly denying parole to plaintiff.  Id. at *6-*11 (quoting
22   Enquist, supra, 128 S. Ct. at 2154).

23           [14] The court narrowly applies the "class of one" equal protection theory to the facts of
     this case.  Stringent application of these standards is intended to prevent indiscriminate reliance
24   on the theory by inmates challenging acts of official discretion.  See e.g. Jennings v. City of
     Stillwater, 383 F.3d 1199, 1210–11 (10th Cir. 2004) (observing that, "unless carefully
25   circumscribed, the concept of a class-of-one equal protection claim could effectively provide a
     federal cause of action for review of almost every executive and administrative decision made by
26   state actors").

1    H.  Fabrication of Evidence Due Process Claim

2              Defendants move for summary judgment on plaintiff's due process claim

3    premised on defendants' alleged fabrication of evidence, now commonly known within the Ninth

4    Circuit as a "Devereaux claim."  See Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir.

5    2001) (en banc); accord, Atkins v. County of Riverside, 151 Fed. Appx. 501, 506 (9th Cir. 2005);

6    Ramirez v. County of Los Angeles, 397 F. Supp .2d 1208, 1226, 1230 (C.D. Cal. 2005); Dinius

7    v. Perdock, 2012 WL 1925666, *11 (N.D. Cal., May 24, 2012); Rose v. City of Wenatchee, 2005

8    WL 1898565, *8-9 (E.D. Wash. 2005).

9              The Fourteenth Amendment provides in pertinent part that, "[n]o State shall ...

10   deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend.

11   XIV, § 1.  To invoke the protections of the Fourteenth Amendment, an inmate "must establish

12   that one of these interests is at stake."  Wilkinson v. Astrue, 545 U.S. 209, 221 (2005); see also

13   Wolff v. McDonnell, 418 U.S. 539, 558 (1974).  The court finds that plaintiff has alleged the

14   deprivation of a cognizable liberty interest based on his allegations that, as a result of defendants'

15   alleged fabrication of evidence, plaintiff was subjected to unwarranted disciplinary proceedings

16   and criminal prosecution, and was retained in administrative segregation for more than two years,

17   the latter, particularly if unwarranted, constituting an "atypical and significant hardship . . . in

18   relation to the ordinary incidents of prison life," Sandin v. Conner, 515 U.S. 472, 484 (1995).

19             The Ninth Circuit recognizes "a clearly established constitutional due process

20   right[15] not to be subjected to criminal charges on the basis of false evidence that was deliberately

21

22        [15]  Although the Ninth Circuit, sitting en banc, declined to characterize the fabrication-of-
     evidence due process claim identified in Devereaux as "substantive," see e.g. Devereaux, 263
23   F.3d at 1074 (identifying only a "clearly established constitutional due process right"), some
     subsequent cases applying Devereaux have expressly characterized the due process right as
24   "substantive," see e.g. Costanich v. Department of Social and Health Services, 627 F.3d 1101,
     1110-11 (9th Cir. 2010); see also Dinius v. Perdock, 2012 WL 1925666, *11 (N.D. Cal., May 24,
25   2012).  "Substantive due process protects individuals from arbitrary deprivation of their liberty
     by government."  Brittain v. Hansen, 451 F.3d 982, 991 (9th Cir. 2006).  "[T]he substantive
26   component of the Due Process Clause is violated by executive action . . . [that is] arbitrary, or
     conscience shocking, in a constitutional sense."  County of Sacramento v. Lewis, 523 U.S. 833,

fabricated by the government." <u>Devereaux</u>, <u>supra</u>, 263 F.3d at 1074-75.  As the First Circuit

observed, "if any concept is fundamental to our American system of justice, it is that those

charged with upholding the law are prohibited from deliberately fabricating evidence and

framing individuals for crimes they did not commit.  Actions taken in contravention of this

prohibition necessarily violate due process (indeed, we are unsure what due process entails if not

protection against deliberate framing under color of official sanction)."  <u>Limone v. Condon</u>, 372

F.3d 39, 44-5 (1st Cir. 2004), citing <u>Devereaux</u>, 263 F.3d at 1074-5; <u>see also</u> <u>Pierce v. Gilchrist</u>,

359 F.3d 1279, 1285 (10th Cir. 2004) (Fourteenth Amendment accords individuals the "right not

to be deprived of liberty without due process of law, or more specifically, as the result of the

fabrication of evidence by a government officer acting in an investigative capacity"); <u>accord</u> <u>Lacy</u>

<u>v. County of Maricopa</u>, 631 F. Supp. 2d 1197, 1206 (D. Ariz. 2008) (citing cases).

   To survive summary judgment on a deliberate fabrication-of-evidence claim,

plaintiff "must, at a minimum, point to evidence that supports at least one of the following two

propositions:  (1) Defendants continued their investigation of [plaintiff ] despite the fact that they

knew or should have known that he was innocent; or (2) Defendants used investigative

techniques that were so coercive and abusive that they knew or should have known that those

techniques would yield false information."  <u>Devereaux</u>, 263 F.3d at 1076 (citations omitted).

   As previously recounted, the instant case is replete with material factual disputes

concerning the alleged fabrication of evidence against plaintiff by defendants Bess and Quist, as

well as these defendants' alleged planting of the evidence on plaintiff and allegedly staged

discovery of the evidence on plaintiff, which led to the allegedly unsupported disciplinary and

criminal proceedings against plaintiff.[16]  Defendants' motions for summary judgment on

---

847 (1998) (citations and internal quotation marks omitted).  This court need not decide the
nature of the due process right recognized in <u>Devereaux</u>.

 [16]  The fact that plaintiff was allegedly subject to an unwarranted disciplinary proceeding
and prolonged placement in administrative segregation may ultimately be relevant to an
assessment of damages.  However, plaintiff's due process claim does not encompass an

plaintiff's fabrication-of-evidence claim are supported by little more than mere denials.  While

the court acknowledges that the relevant material factual disputes are largely dependent on

witness credibility, and defendants may be vindicated at trial, plaintiff's evidence (particularly

his acquittal on the resulting criminal charges) is sufficient to overcome defendants' summary

judgment motions.  Whether defendants fabricated evidence against plaintiff, and thus engaged

in abusive investigative techniques for the purpose of yielding false information, Devereaux, 263

F.3d at 1076, remain material factual disputes.  As another magistrate judge, previously assigned

this case, found in 2006:

> Defendants claim there is no evidence indicating they violated
> plaintiff's right to due process because critical predicate facts
> precluded the violation plaintiff claims from occurring in the first
> place.  Defendants present evidence indicating plaintiff could not
> have come into contact with "Crazy-D" on October 11, 1998
> because plaintiff was housed in "B" facility, "Crazy-D" was
> housed in "C" facility, and inmates from "B" facility are not
> permitted contact with inmates from "C" facility.  MSJ, Exs. A &
> B.  Therefore, defendants argue, it is clear that plaintiff's story
> regarding the planting of the drugs in the manila envelope was
> fabricated.  In his own declaration, attached to the end of his
> opposition to defendants' motion, plaintiff asserts under the
> penalty of perjury that he and "Crazy-D" were housed in the same
> facility on October 11, 1998 and the information provided by
> defendants is fabricated.  In light of these two starkly differing
> versions of the facts, there is a genuine issue of material fact with
> respect to whether plaintiff came into contact with "Crazy-D" on
> October 11, 1998.  Defendants are not entitled to summary

---

actionable procedural challenge to plaintiff's disciplinary proceeding.

Due process in a prison disciplinary proceeding is satisfied when the hearing is conducted
by a neutral fact-finder and the inmate is provided:  (1) written notice of the charges; (2) a
statement of the evidence relied on by prison officials and the reasons for the disciplinary action;
and (3) the opportunity to call witnesses and present evidence if doing so would not unduly
threaten institutional safety and goals.  Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974).  Due
process requires that a disciplinary board's revocation of good time credits be supported by some
evidence in the record.  Superintendent v. Hill, 472 U.S. 445, 454-55 (1985).

As asserted by defendants, and unrefuted by plaintiff, plaintiff received all required
procedural protections attendant to his related disciplinary hearing:  specifically, plaintiff
received written notice of the charge against him; had an opportunity to call witnesses and
present evidence; and received a statement of the reasons and evidence relied upon in support of
the disciplinary decision.  Wolff, 418 at 563-66.  Moreover, because plaintiff did not lose any
good-time credits, no liberty interest was implicated on that basis by the April 22, 1999
disciplinary finding of plaintiff's guilt.

1    judgment based upon their assertion that plaintiff and "Crazy-D"
     did not come into contact with one another.
2

3    (March 8, 2006 Findings and Recommendations (Dkt. No. 104 at 6).)

4           Moreover, significantly, in 2008, counsel for defendants Bess and Quist conceded

5    before the Court of Appeals that there remained "a question of fact as to whether or not the

6    fabrication of evidence did occur . . . . that issue needs to go back for trial on that disputed issue

7    of fact."  (Case No. 06-15805, Court of Appeal Transcript, Mar. 14, 2008, at 8.)

8           For these reasons, defendants' motions for summary judgment on plaintiff's

9    fabrication-of-evidence ("Devereaux") due process claim must be denied.

10          I.  Malicious Prosecution Claim

11          Defendants move for summary judgment on plaintiff's federal malicious

12   prosecution claim.  Although plaintiff is precluded from pursuing his state law malicious

13   prosecution claim, due to his inability to demonstrate compliance with the requirements of the

14   California Tort Claims Act, the Ninth Circuit recognizes a federal malicious prosecution claim,

15   pursuant to 42 U.S.C. § 1983.  See Usher v. City of Los Angeles, 828 F.2d 556, 561-62 (9th Cir.

16   1987); Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995); Awabdy v. City of

17   Adelanto, 368 F.3d 1062, 1066-72 (9th Cir. 2004).

18           The Ninth Circuit observed in 1987:

19          In this circuit, the general rule is that a claim of malicious
            prosecution is not cognizable under 42 U.S.C. § 1983 if process is
20          available within the state judicial system to provide a remedy.
            However, an exception exists to the general rule when a malicious
21          prosecution is conducted with the intent to deprive a person of
            equal protection of the laws or is otherwise intended to subject a
22          person to a denial of constitutional rights.

23   Usher v. City of Los Angeles, supra, 828 F.2d at 561-62 (citations and internal quotation marks

24   omitted).  The Ninth Circuit has continued to reaffirm this exception, without treading on the

25   Supreme Court's reticence to recognize substantive due process rights.  See e.g. Albright v.

26   ////

Oliver, 510 U.S. 266 (1994).[17]  Thus, in 2004, the Ninth Circuit again noted:

> In decisions subsequent to Albright, we have continued to follow our earlier precedents establishing that "malicious prosecution with the intent to deprive a person of equal protection of the law or otherwise to subject a person to a denial of constitutional rights is cognizable under § 1983." Poppell v. City of San Diego, 149 F.3d 951, 961 (9th Cir. 1998) (citing Usher, 828 F.2d at 562).

Awabdy v. City of Adelanto, 368 F.3d at 1069 (further citations omitted); see also id. at 1066

("[i]n order to prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the

defendants prosecuted him with malice and without probable cause, and that they did so for the

purpose of denying him equal protection or another specific constitutional right'") (quoting

Freeman v. City of Santa Ana, supra, 68 F.3d at 1189 (9th Cir. 1995) (citations omitted))

(internal editing omitted).[18]

---

[17]  In Albright v. Oliver, supra, 510 U.S. 266, the Supreme Court plurality held that "the right to be free from prosecution without probable cause" does not implicate substantive due process rights, but only the specific protections accorded by the Bill of Rights, particularly the Fourth Amendment proscription against unreasonable searches and seizures.  "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" Albright, 510 U.S. at 273 (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).

The Court did not reach the petitioner's malicious prosecution claim, because it was dismissed below.  However, the Court observed "an embarrassing diversity of judicial opinion" among the Courts of Appeal regarding "the extent to which a claim of malicious prosecution is actionable under § 1983." Albright, 510 U.S. at 271 n.4 (citations and internal quotation marks omitted).  The Court noted in pertinent part:

> Most of the lower courts recognize some form of malicious prosecution action under § 1983. The disagreement among the courts concerns whether malicious prosecutions, standing alone, can violate the Constitution. . . . [Some] Circuits require a showing of some injury or deprivation of a constitutional magnitude in addition to the traditional elements of common-law malicious prosecution. . . . [See, e.g.] Usher v. Los Angeles, 828 F.2d 556, 561–562 (9th Cir. 1987).

Albright, 510 U.S. at 271 n.4 (additional citations omitted).

[18]  The Ninth Circuit noted "considerable confusion among the other circuits that have attempted to determine the applicable law as established by Albright.  See Castellano v. Fragozo, 352 F.3d 939, 949-53 (5th Cir. 2003) (collecting cases)." Awabdy, 368 F.3d at 1070 n.4.  Nevertheless, the Court of Appeals noted:

The court finds that this threshold requirement for pursuing a Section 1983 malicious prosecution claim in the Ninth Circuit,[19]-- the alleged violation of an independent constitutional right -- is met in the instant case by plaintiff's claim, found by this court to survive summary judgment, that defendants violated his equal protection rights under a "class of one" theory.

Next, the court must look to California law to assess whether plaintiff has adequately pled, and presented sufficient evidence in support of, a Section 1983 malicious prosecution claim. Usher, 828 F.2d at 562; Awabdy, 368 F.3d at 1067. Significantly, "[m]alicious prosecution actions are not limited to suits against prosecutors but may be brought . . . against other persons who have wrongfully caused the charges to be filed." Awabdy, 368 F.3d at 1066, citing Galbraith v. County of Santa Clara, 307 F.3d 1119, 1126-27 (9th Cir. 2002). Under California law, a malicious prosecution claim requires proof that the challenged action was:  (1) commenced by or at the direction of the defendant and was pursued to a legal termination in plaintiff's favor; (2) brought without probable cause; and (3) initiated with malice. Zamos v. Stroud (2004) 32 Cal. 4th 958, 965-66 (citations omitted). In addition, plaintiff must demonstrate "resulting damage." Estate of Tucker ex rel. Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1030 (9th Cir. 2008), cert. denied, 128 S. Ct. 174 (2008).

---

The differences among the various approaches are often less significant than may appear, however. For example, unlike our court and the Third Circuit, see Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782 (3d Cir. 2000), the Fourth, Fifth, and Seventh Circuits do not allow malicious prosecution claims under § 1983, even for Fourth Amendment violations. Instead, they employ the more straight-forward approach of allowing a § 1983 action based directly on the implicated constitutional provision . . . Yet nothing in this circuit's case law prevents plaintiffs from pursuing their claims under § 1983 by using this more direct approach instead of, or in addition to, a malicious prosecution theory. . . .

Awabdy, 368 F.3d at 1070 n.4.

[19]  Consistent with the weight of current case law in this circuit, this court declines to characterize plaintiff's Section 1983 malicious prosecution claim as a "due process" or "substantive due process" claim; nevertheless, the court finds this claim encompassed by plaintiff's Second Cause of Action.

1           The court finds that plaintiff has presented evidence demonstrating that each of

2 these elements is either undisputed or involves material factual disputes sufficient to rebut

3 defendants' evidence submitted in support of their motions for summary judgment.  It is

4 undisputed that the subject criminal prosecution was terminated in plaintiff's favor.  Further,

5 viewing the evidence in the light most favorable to plaintiff, a jury could reasonably find that

6 defendants Bess and Quist were "actively instrumental in causing the prosecution," Sullivan v.

7 County of Los Angeles (1974) 12 Cal. 3d 710, 720.  ""[T]he test of liability in an action for

8 malicious prosecution is whether the defendant was actively instrumental or was the proximate

9 and efficient cause of maliciously putting the law in motion."  Bernstein v. Maimes (1954) 126

10 Cal. App. 2d 468, 475 (quoting Centers v. Dollar Markets (1950) 99 Cal. App. 2d 534, 544).

11 The court is not persuaded by defendants' contention that plaintiff's criminal prosecution was

12 otherwise justified by plaintiff's concession that he had been in possession of the eyedropper

13 bottle containing heroin residue.  The evidence reasonably supports plaintiff's assertion that he

14 reminded defendant Quist of the eyedropper bottle, and was instrumental in obtaining its

15 introduction into evidence, only because plaintiff believed that it would prove that he was a

16 heroin "user," not a "trafficker," thereby demonstrating that the heroin bindle had been planted –

17 according to plaintiff, absent defendants' alleged misconduct, plaintiff would not have disclosed

18 this information.

19           It also remains a material factual dispute whether plaintiff's prosecution was

20 supported by probable cause.  "Probable cause . . . is a question of law that turns on whether the

21 underlying claim was legally tenable, as determined on an objective basis. . . . [P]robable cause is

22 measured by the state of the defendant's knowledge, not by his intent."  Estate of Tucker, 515

23 F.3d at 1031 (citations and internal quotation marks omitted).  Contrary to defendants' assertions

24 herein, a plaintiff can rebut the implicit finding of probable cause inherent in the decision of a

25 prosecutor or court to proceed to trial, by showing that the prosecution in its entirety was induced

26 by deception.  Awabdy, 368 F.3d at 1067.  The fabrication of evidence that is instrumental in

1    bringing a criminal prosecution effectively cancels any subsequent finding of probable cause by

2    officials unaware of the underlying misconduct.  Id.[20]

3              Finally, there remains a material factual dispute whether defendants' alleged

4    instigation of the criminal prosecution against plaintiff was motivated by malice.  "The 'malice'

5    element of the malicious prosecution tort relates to the subjective intent or purpose with which

6    the defendant acted in initiating the prior action. . . . Malice is present when proceedings are

7    instituted primarily for an improper purpose.  Suits with the hallmark of an improper purpose

8    [include] those in which:  . . . the proceedings are begun primarily because of hostility or ill will.

9    . . . Malice is usually a question of fact for the jury to determine. "  Estate of Tucker, 515 F.3d at

10   1030 (citations and internal quotation marks omitted).  Plaintiff's evidence in support of his

11   allegation that defendants Bess and Quist acted together in retaliation against plaintiff for his

12   refusal to cooperate with defendant Bess renders the question of malice a material factual dispute

13   that cannot be resolved on summary judgment.

---

15   [20]  In Awabdy, the Ninth Circuit held that a Section 1983 malicious prosecution claim
     could be maintained against city officials for allegedly conspiring to provide the county
16   prosecuting attorney with false accusations that plaintiff had embezzled public funds.  The court
     rejected the theory that defendant city officials should be shielded from liability because they
17   were not responsible for the actual prosecution of plaintiff.  Applicable to the instant case as
     well, the Ninth Circuit reasoned:

18       In California, as in virtually every other jurisdiction, it is a long-standing principle
         of common law that a decision by a judge or magistrate to hold a defendant to
19       answer after a preliminary hearing constitutes prima facie -- but not conclusive --
         evidence of probable cause.  Among the ways that a plaintiff can rebut a prima
20       facie finding of probable cause is by showing that the criminal prosecution was
         induced by fraud, corruption, perjury, fabricated evidence, or other wrongful
21       conduct undertaken in bad faith. . . . Ordinarily, the decision to file a criminal
         complaint is presumed to result from an independent determination on the part of
22       the prosecutor, and thus, precludes liability for those who participated in the
         investigation or filed a report that resulted in the initiation of proceedings.
23       However, the presumption of prosecutorial independence does not bar a
         subsequent § 1983 claim against state or local officials who improperly exerted
24       pressure on the prosecutor, knowingly provided misinformation to him, concealed
         exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that
25       was actively instrumental in causing the initiation of legal proceedings.

26   Awabdy v. City of Adelanto, 368 F.3d at 1067 (citations omitted).

1        Finally, the court finds that plaintiff has demonstrated "resulting damage" due to

2   his alleged malicious prosecution.  At minimum, and as the court earlier found, the retention of

3   plaintiff in administrative segregation for more than two years, assuming his innocence,

4   constituted an "atypical and significant hardship."  Sandin v. Conner, supra, 515 U.S. at 484.

5   When government officials abuse their authority, "action[s] for damages may offer the only

6   realistic avenue for vindication of constitutional guarantees."  Harlow v. Fitzgerald, supra, 457

7   U.S. at 814.

8        J.  Qualified Immunity

9         Defendants Bess and Quist each move for summary judgment on qualified

10  immunity grounds.[21]

11       "Qualified immunity balances two important interests -- the need to hold public

12  officials accountable when they exercise power irresponsibly and the need to shield officials from

13  harassment, distraction, and liability when they perform their duties reasonably."  Pearson v.

14  Callahan, 555 U.S. 223, 231 (2009).  The objective of the qualified immunity doctrine is to

15  ensure "that 'insubstantial claims' against government officials be resolved prior to discovery

16  and on summary judgment if possible."  Anderson v. Creighton, 483 U.S. 635, 640 n.23 (1987),

17  citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  Meeting this objective requires that

18  immunity questions be resolved "at the earliest possible stage in litigation."  Hunter v. Bryant,

19  502 U.S. 224, 227 (1991) (per curiam).

20  ////

21

22       [21]  The court notes that a magistrate judge and district judge previously assigned this case
    relied on Albright, supra, 510 U.S. 266, to find defendants Bess and Quist protected from this
23  action by qualified immunity.  (See Dkt. Nos. 104, 107.)  Construing plaintiff's Second Cause of
    Action only as a broad substantive due process claim, the district court, in 2006, relied on
24  Albright to find the claim noncognizable, concluding that, "[i]n light of Albright, defendants are
    entitled to qualified immunity because they did not violate a clearly established federal statutory
    or constitutional right of which a reasonable person would have known."  (Dkt. No. 104 at 7.)
25       However, as previously noted, pursuant to the parties' agreement on appeal, the Court of
    Appeals, in 2009, remanded this case for the district court's renewed consideration on the merits
26  of plaintiff's broadly alleged due process and equal protection claims.  (Dkt. No. 119.)

1         "The doctrine of qualified immunity protects government officials from liability

2   for civil damages insofar as their conduct does not violate clearly established statutory or

3   constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555

4   U.S. 223, 231 (2009).  The defendant bears the burden of establishing qualified immunity.

5   Crawford-El v. Britton, 523 U.S. 574, 586-87 (1998).  The Supreme Court, in Saucier v. Katz,

6   533 U.S. 194 (2001), outlined a two-step approach to qualified immunity.  The first step requires

7   the court to ask whether, "[t]aken in the light most favorable to the party asserting the injury, do

8   the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at

9   201.  The second inquiry is whether the right was clearly established, in other words, "whether it

10  would be clear to a reasonable officer that his conduct was unlawful in the situation he

11  confronted." Id.  In Pearson, supra, 555 U.S. 223, the Supreme Court gave district courts

12  discretion to grant qualified immunity on the basis of the "clearly established" prong alone,

13  without deciding in the first instance whether any right had been violated.  Id. at 236; accord

14  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011).

15        The court denies qualified immunity on the ground that the relevant law was

16  clearly established in October 1998, and should have been clear to a reasonable correctional

17  officer.  As recounted in this order, the Ninth Circuit has long recognized a Section 1983 claim

18  for malicious prosecution, pursuant to consistent standards, as set forth herein.  See Usher, 828

19  F.2d at 561-62; accord Awabdy, 368 F.3d at 1069.

20        In addition, while the Ninth Circuit did not clearly articulate until 2001, "a clearly

21  established constitutional due process right not to be subjected to criminal charges on the basis of

22  false evidence that was deliberately fabricated by the government," Devereaux v. Abbey, supra,

23  263 F.3d at 1074-75, the Court of Appeals noted that "[p]erhaps because the proposition is

24  virtually self-evident, we are not aware of any prior cases that have expressly recognized this

25  specific right, but that does not mean that there is no such right," id. at 1075; see also County of

26  Sacramento v. Lewis, supra, 523 U.S. at 845-50 ("[s]ince the time of our early explanations of

1   due process, we have understood the core of the concept to be protection against arbitrary

2   action") (citing cases spanning two centuries).

3          Similarly, while decisional precedent is limited on plaintiff's "class of one" equal

4   protection theory, the wrongfulness of the alleged underlying conduct in this case is self-evident,

5   viz., an allegedly intentional endeavor to frame plaintiff based on fabricated evidence, in

6   retaliation for his refusal to engage in illegal conduct.  "Precedent directly on point is not

7   necessary to demonstrate that a right is clearly established.  Rather, if the unlawfulness is

8   apparent in light of preexisting law, then the standard is met.  In addition, even if there is no

9   closely analogous case law, a right can be clearly established on the basis of common sense."

10  Giebel v. Sylvester, 244 F.3d 1182, 1189 (9th Cir. 2001) (citation and internal quotation marks

11  omitted).[22] Accord Harris v. Roderick, 126 F.3d 1189, 1198 (9th Cir. 1997), cert. denied, Smith

12  v. Harris, 522 U.S. 1115 (1998) (defendant officers "could not reasonably have been under any

13  illusion that they could lawfully conspire to concoct and disseminate false reports and escape

14  _____

15         [22] As earlier explained by the Ninth Circuit:

16             For qualified immunity purposes, a right "must [be] 'clearly
               established' in a more particularized, and hence more relevant,
17             sense:  The contours of the right must be sufficiently clear that [at
               the time the allegedly unlawful action is taken] a reasonable
18             official would understand that what he is doing violates that right."
               Id. [Anderson v. Creighton, supra, 483 U.S.] at 640.  See also
19             Romero [v. Kitsap County], 931 F.2d [624 (1991)] at 629 .  This
               does not mean that any official action is protected by qualified
20             immunity "unless the very action in question has previously been
               held unlawful," but it does require that "in the light of pre-existing
21             law the unlawfulness must be apparent."  Anderson, 483 U.S. at
               640.  Thus, when "the defendants' conduct is so patently violative
22             of the constitutional right that reasonable officials would know
               without guidance from the courts" that the action was
23             unconstitutional, closely analogous pre-existing case law is not
               required to show that the law is clearly established.  Casteel v.
24             Pieschek, 3 F.3d 1050, 1053 (7th Cir. 1993).

25  Mendoza v. Block, 27 F.3d 1357, 1361 (9th Cir. 1994.)

26

responsibility for the consequences of their misdeeds"); <u>Chweya v. Baca</u>, 130 Fed. Appx. 865, 868-69 (9th Cir. 2005) ("it is certainly 'clearly established' that an officer may not fabricate a charge against a defendant").

As to each of these claims, the court acknowledges that "an improper motive ordinarily will not defeat a request for qualified immunity." <u>Prison Legal News v. Lehman</u>, 397 F.3d 692, 703 (9th Cir. 2005), citing <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 (1998). However, this general rule does not apply when the allegedly improper motive is the moving force in singling out an individual for arbitrary, discriminatory, and therefore fundamentally unconstitutional, treatment.  <u>Prison Legal News</u>, 397 F.3d at 703.

Construing the disputed facts in the light most favorable to plaintiff reasonably supports a finding that defendants violated clearly established constitutional rights of which a reasonable official should have been aware.  <u>Anderson</u>, <u>supra</u>, 483 U.S. at 640.  Accordingly, the court finds that neither defendant Bess nor Quist are entitled to qualified immunity.

VIII.  <u>Conclusion</u>

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Defendant Pliler's motion for summary judgment (Dkt. No. 201), is granted in its entirety; defendant Pliler is dismissed from this action.

2.  The separate motions for summary judgment and/or adjudication filed by defendants Bess and Quist (Dkt. Nos. 197, 200), are each granted in part, and denied in part.

3.  The court grants defendants' motions for summary judgment on plaintiff's Eighth Amendment claim and state law malicious prosecution claim.

4.  The court denies defendants' motions for summary judgment on plaintiff's federal claims premised on conspiracy, equal protection, fabrication of evidence, and malicious prosecution; and denies defendants' related qualified immunity defenses.

5.  Within thirty days after the filing date of this order, counsel for all parties shall file a joint statement that provides the following:

a.  The parties shall address whether there is any reason that the court should not presently set pretrial and trial dates, and related deadlines.  The parties shall identify the anticipated length of trial, and also identify any dates within the next year when they may be unavailable for trial or a trial confirmation hearing.

b.  The parties shall address whether it may be helpful to convene a settlement conference.  If so, the parties shall indicate whether they consent to convening such conference before the undersigned magistrate judge, or would prefer assignment of another magistrate judge.

SO ORDERED.

DATED:  August 8, 2012

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Chap1979.MSJ.wpd